## COMMONWEALTH *vs.* WILLIAM SANTOS.

Middlesex. April 8, 2011. - August 27, 2012.

Present: IRELAND, C.J., SPINA, BOTSFORD, GANTS, & DUFFLY, JJ.

*Homicide. Robbery. Constitutional Law,* Admissions and confessions, Waiver
of constitutional rights, Confrontation of witnesses. *Evidence,* Admissions
and confessions, Voluntariness of statement, Statement of codefendant,
Testimony before grand jury, Prior conviction, Prior misconduct, Third-
party culprit. *Practice, Criminal,* Capital case, Admissions and confes-
sions, Voluntariness of statement, Waiver, Confrontation of witnesses,
Grand jury proceedings. *Grand Jury. Waiver.*

At the trial of indictments charging armed robbery and murder in the first
degree on a theory of felony-murder, the judge erred in admitting in evidence
statements that the defendant made to police, where, although in the unusual
circumstances of the case (i.e., after an initial waiver of Miranda rights, the
defendant unambiguously requested an attorney, but then appeared im-
mediately and without police interruption to qualify the request and to
indicate that he only wanted an attorney if the police officers continued
questioning him about one subject) a reasonable interrogating officer might
have been uncertain whether the defendant had invoked his right to counsel,
the questions posed by one officer after the invocation of the right to
counsel were not clarifying but, rather, were designed to elicit further
statements by the defendant if the officers agreed not to ask about that one
subject; further, the admission of an audiotape recording of the defendant's
statement was not harmless beyond a reasonable doubt, in that admission
of the statement allowed the prosecutor to challenge the credibility of the
defendant (who did not testify) and to introduce multiple references to
prior bad acts of the defendant and additional evidence of his previous
convictions. [283-289]

At a murder trial involving two defendants, a substantial likelihood of a
miscarriage of justice arose from the erroneous admission in evidence of a
statement made by the codefendant concerning the defendant, where the
statement had not been made in furtherance of a common mutual interest
but, rather, to exculpate the codefendant and distance himself from the act
of the other joint venturers; and where the statement was powerfully
incriminating. [289-293]

At the trial of indictments charging armed robbery and murder in the first
degree, the admission of a statement made by a codefendant to police was
error, where it had not been made during the pendency of a joint venture
[293-294]; further, a witness's testimony before the grand jury was
improperly admitted substantively and without limitation, where the judge
made no findings that would have permitted the admission of such testimony

as the prior inconsistent statement of a witness whose lack of memory at trial was feigned [294-295]; moreover, the judge erred in admitting evidence of the defendant's prior convictions that was cumulative of other evidence and of little probative value [295-296], and also erred in admitting testimony that served merely to paint the defendant as a violent person of bad character [296]; finally, the judge erred in denying the defendant's motion to introduce third-party culprit evidence that was not speculative, attenuated, or remote [296-298].

INDICTMENTS found and returned in the Superior Court Department on September 15, 2005.

A pretrial motion to suppress evidence was heard by *Elizabeth M. Fahey*, J., and the cases were tried before *Frances A. McIntyre*, J.

*Leslie W. O'Brien* for the defendant.

*Robert J. Bender*, Assistant District Attorney (*Elizabeth A. Dunigan*, Assistant District Attorney, with him) for the Commonwealth.

DUFFLY, J. A Superior Court jury convicted the defendant of armed robbery and murder in the first degree on a theory of felony-murder in the shooting death of Luis Daniel Rodriguez. On appeal, the defendant claims error in the admission in evidence of statements he made to police following his arrest on unrelated charges; statements made by his codefendant admitted through testimony of the codefendant's sister; grand jury testimony by the codefendant's sister, admitted substantively; and testimony of a witness who saw the defendant near the scene of the shooting that he had served time in prison with the defendant. The defendant contends also that we should exercise our power under G. L. c. 278, § 33E, to grant him a new trial. Because errors in the admission of certain evidence created a substantial likelihood of a miscarriage of justice, we reverse the defendant's convictions and remand the case for a new trial.

*Background.* We recite the facts the jury could have found, reserving some details for later discussion.

1. *The shooting.* On July 26, 2005, the victim was shot in the chest across the street from the Pawtucket Pharmacy (pharmacy) in Lowell, ran through traffic with a group of other young men, and collapsed in a pool of blood in the doorway to the pharmacy.

The shooting took place at approximately 5:36 P.M. at one of the busiest intersections in Lowell. Many witnesses, including drivers waiting for the traffic signals to change, pedestrians, and residents of nearby apartments, described the event to police, but none was able to identify any of the participants. All of the witnesses reported that the participants were young, Hispanic males.

The evidence concerning the planning of the robbery by the defendant and the codefendant, Jose Luis Claudio Benitez (Claudio),[1] and the flight from the scene of the shooting, was introduced through the Commonwealth's key witness, Jesus Antonio Marquez,[2] the driver of the getaway vehicle. The defendant and Claudio knew the victim and knew that he was a heroin dealer; the defendant had purchased heroin from the victim on a number of occasions. On July 26, 2005, Claudio telephoned the victim's cellular telephone number and arranged to purchase eighty dollars' worth of heroin. The transaction was to take place at a grocery store near the victim's home. Claudio drove the defendant and Marquez to the planned meeting location in a white Honda automobile owned by Marquez.[3]

When they arrived at the grocery store, the victim was not present; Claudio telephoned the victim again and arranged to meet in the parking lot of a Red Cross building next door to the victim's apartment building on Pawtucket Street. Claudio then suggested that they rob the victim, and the defendant, saying that the victim owed him money, agreed to participate in the robbery. En route, with Marquez driving, Claudio handed the defendant a pistol, saying, "Don't go shooting [the victim], you know; just rob him. Don't go shooting him if he don't got nothing." The defendant replied, "I'm going to get my money, but I ain't stupid. I'm not going to shoot him." Marquez parked

[1]Although he was indicted under the name Jose Benitez, we refer to the codefendant by the name used at trial, Jose Luis Claudio.

[2]Jesus Antonio Marquez testified under a plea agreement that specified that a sentence had not been determined; however, the agreement provided that Marquez would be charged only with being an accessory before the fact to armed robbery.

[3]Marquez was a friend of Claudio. Claudio introduced Marquez to the defendant a few weeks before the shooting; they had seen each other two or three times prior to the day of the shooting.

on School Street a few houses from the intersection with Pawtucket Street; as the defendant and Claudio were heading down School Street, Claudio told Marquez not to leave. Shortly thereafter, Marquez heard a gunshot.

Approximately six minutes after Marquez heard the gunshot, he saw the defendant running toward him up School Street from the direction of Pawtucket Street, turned the vehicle around, and picked up the defendant. The defendant urged Marquez to leave, but Marquez refused. Claudio then ran around the corner and was able to get into the back seat of the vehicle. He turned to the defendant and asked, "Why did you shoot him, you know? I told you not to shoot him. I told you not to smoke him. Why did you shoot him?"

Claudio directed Marquez to drive to the apartment of Claudio's sister, Olga Gonzalez, overriding the defendant's request to be driven to the apartment where he was staying. Marquez drove to Gonzalez's apartment and parked in the back. Because Gonzalez did not know Marquez or the defendant, she would not permit them to enter her apartment; they remained in back of the apartment building while Claudio went inside the apartment. Claudio asked for a towel and a change of clothes; he told Gonzalez that "[h]e told him not to do it" and that "the other guy shot someone" even though Claudio had told him not to do so.

Claudio made several calls from Gonzalez's home telephone. Gonzalez then went outside with Claudio for a few minutes. The defendant offered Gonzalez a distinctive gold necklace with a jeweled crucifix; saying she "had a man," Gonzalez refused to accept it.[4] While Marquez and the defendant waited in the back yard, Claudio walked down the street to talk to one of Gonzalez's neighbors, Migdalia Fontanez, a good friend and former girl friend of Claudio and the godmother of Gonzalez's daughter. The defendant and Marquez left together; Marquez drove the defendant to the address he requested, near the home of someone named "Humble," whom Marquez identified as a friend of Claudio and an acquaintance of Marquez.

A tall, light-skinned Puerto Rican man known as "T," and

---

[4]Marquez testified that Gonzalez neither saw nor was offered a necklace.

later identified as Thomas Louis Clermont, arrived in a small, white Honda Civic automobile. Marquez returned from dropping off the defendant to pick up Claudio, and Claudio, Marquez, and Clermont talked for a while. Clermont told Claudio, "It's my biscuit. I'll take it," and Claudio handed him a gun wrapped in a towel. Marquez testified that Claudio decided not to accept a ride with Marquez and that Clermont and Claudio left together in Clermont's white vehicle while Marquez drove to his girl friend's house. Fontanez testified that Claudio and Clermont drove off together in the small white vehicle that Clermont had been driving. Clermont was called to testify at trial. Outside the presence of the jury, he asserted his privilege against self-incrimination under the Fifth Amendment to the United States Constitution.

2. *The investigation.* At the time of the shooting, Francis Kelly, Sr., an off-duty Chelmsford police officer, and his son, Francis Kelly, Jr., an off-duty Lowell fire fighter, were in a pickup truck on Pawtucket Street, stopped for a traffic light a few vehicles away from the intersection with School Street. They saw four young, Hispanic males[5] run from the parking lot of the Red Cross building, cross the street through heavy traffic on Pawtucket Street, and head toward School Street. At the entrance to the pharmacy, one of the men stumbled and fell. Two stopped and appeared to be trying to help the man who had fallen, then continued running up School Street; the fourth stayed over the man for a few seconds, then ran up School Street as well.[6] The Kellys pulled into the pharmacy parking lot and went to assist the victim. He was lying face down, moaning but unresponsive. The Kellys telephoned police, then turned the victim over and saw that he had been shot. Emergency medical personnel arrived immediately thereafter and transported the victim to a hospital, where he died as a result of a single gunshot wound to the chest.

---

[5]The defendant was forty-one years old in 2005 and had prominent tattoos the length of both arms. He was described by Detective Corey Erickson and Marquez as "bald" or "balding." On the day of the shooting, witnesses testified that the defendant was wearing a white tank top that left his arms exposed.

[6]Both Francis Kelly, Sr., and Francis Kelly, Jr., estimated the men to be in their late teens or early twenties; none appeared to be carrying anything. They were not able to identify the individuals, but stated that they did not remember seeing a forty to forty-two year old male with tattoos covering both arms.

Shortly before the shooting, the victim, who was a frequent customer, had purchased a bottle of soda at the pharmacy. He was wearing a distinctive jeweled crucifix on a gold chain that he was known to wear habitually. Police found sandals and several packages of heroin in the parking lot of the Red Cross building.[7] A blood trail led from these items to the doorway of the pharmacy.

Two pedestrians (twelve and fourteen year old siblings) reported seeing a darker-skinned Hispanic male running toward them, up the hill on School Street in the direction leading away from Pawtucket Street. Another witness, who was in a car waiting at the traffic light on School Street, saw four males, one African-American and the others Caucasian or Hispanic, running along Pawtucket Street away from the pharmacy. A witness who was unloading groceries from a taxicab saw a "group" of "like four or five boys" she described as "light skinned" in the parking lot of the Red Cross building; they were standing in the lot talking and then started heading up the street when the witness heard a gunshot and saw the victim crossing the street toward the pharmacy. One of the boys snatched something from the victim, the boys "split up," and they all "started running." A resident of School Street, who was driving past her house, saw an older white automobile, which she identified as a Honda, parked in her driveway. The vehicle had one male occupant, wearing a blue and white "do-rag"; he turned and looked directly at her. The resident continued around the block and parked in back of her house. When she entered her house, the white vehicle was no longer in her driveway. The resident was unable to identify the driver from a photographic array. Another witness, driving on School Street, saw two Hispanic males, in their "late teens or early twenties," run around the corner from Pawtucket Street. One, wearing white, was running ahead of the other, and

---

[7]The victim's girl friend testified that she and her daughter, who had planned to go to the beach with the victim, waited in the vehicle in the parking lot behind the Red Cross building across the street from the pharmacy. The victim, after receiving several telephone calls on his cellular telephone, said that he would get a soda for her daughter and would be right back. She spent approximately thirty minutes trying unsuccessfully to reach the victim on his cellular telephone or at his apartment, at which point police came by and asked her what she was doing waiting in the car.

got into a white Honda that was pulling out of a driveway and partially blocking traffic. The vehicle started driving up School Street. The second man, wearing a numbered sports jersey, was holding a dark object that the witness thought might have been a gun tucked in his waistband; because the traffic light changed, the witness did not see whether the second individual reached the Honda.

Police investigated the telephone numbers recorded in the victim's cellular telephone that were called during the last hours of his life. One of these callers was Daniel Pacheco, a heroin user well known to police. Pacheco previously had purchased heroin from the defendant,[8] and had also been incarcerated in the Department of Correction's classification center at the Massachusetts Correctional Institution at Concord (MCI-Concord) at the same time as the defendant. He testified that the defendant was "a good friend of mine." The defendant had introduced Pacheco to the victim as another potential source of heroin.

After initially denying any knowledge of the events on the day of the shooting, Pacheco admitted that he had purchased ten packages of heroin from the victim, in front of the pharmacy, just before the shooting. He stated further that he had seen the defendant standing on the corner near the pharmacy shortly after he made the purchase, wearing a white sleeveless shirt. The defendant seemed to be waiting for a dark-skinned Hispanic man who was talking on a cellular telephone as he was coming out of the pharmacy. Pacheco identified the defendant from prison photographs obtained by police.

3. *Arrest and interview of the defendant.* Based on Pacheco's statement, police decided to interview the defendant as a potential witness. They learned that he had two outstanding default warrants, for a probation violation and a drug offense, and sought to arrest him on those warrants. While police were driving near an apartment building where they believed the defendant was living part time, they saw him on the sidewalk in front of the building. He appeared to be trying to enter the passenger side of a small, white Honda Civic automobile. As they approached, the defendant turned and ran through the building and into the

---

[8]The defendant was known to Pacheco and others, and referred to at trial, as "Smokey."

back yard. He was seized following a foot chase. As he was being taken into custody, the defendant asked, "What am I arrested for?" The arresting officer replied, "[D]rug warrants," and the defendant responded, "Is that it?"

At the police station, the defendant agreed to speak with police about the shooting. Throughout the interview, which lasted several hours, the defendant denied any knowledge of the crime or the pharmacy. He admitted that he was a heroin addict and stated that he was withdrawing from heroin at the time of the interview. He also admitted that he had been in prison on drug charges.

4. *Arrest of Marquez.* Police investigated a cellular telephone number being used by Claudio that showed two calls to the victim shortly before his death. They went to the apartment where Claudio, Michelle Johnson (Claudio's girl friend), the defendant, and his wife were living. Johnson, who was there with Marquez, allowed them to enter and agreed to speak with them at the police station. An older white Honda Civic automobile, matching witness descriptions of the getaway vehicle, was parked outside the apartment building. Marquez admitted that the automobile was his; he gave police permission to search the vehicle and also agreed to go to the police station to speak with police. During his first interview, Marquez told police that he had loaned the vehicle to "Lou"[9] between 5 and 6 P.M. on the previous evening, Marquez's cellular telephone had been left charging in the vehicle, and he had not seen the cellular telephone since that time. Marquez and the defendant's wife left the police station.

Subsequently, police learned that calls had been placed from Claudio's cellular telephone to Gonzalez's home telephone number in the minutes after the shooting. They interviewed Gonzalez, who recounted the codefendants' visit to her home on the evening of the shooting. Police then reinterviewed Marquez. After initially repeating his earlier denials, Marquez gave police a detailed description of the planned robbery and subsequent events.

5. *Prior proceedings.* The defendant filed a motion in limine

---

[9]Claudio was known to many of the witnesses, and to the defendant, as "Lou" or "Brooklyn."

seeking to suppress statements he made to police while he was being detained on the default warrants. This motion was denied. Claudio's motion to sever was denied by a different Superior Court judge. On April 14, 2008, during empanelment proceedings, both the defendant and Claudio requested that the trial judge reconsider the motion to sever; this motion was denied after a hearing on April 15. Trial began the following day. The jury found the defendant guilty of murder on a theory of felony-murder and not guilty on a theory of deliberate premeditation.[10] This appeal followed.

*Discussion.* 1. *Admission of the defendant's statements.* As stated, after the defendant was identified by Pacheco as having been at the intersection near the pharmacy shortly before the murder, the police learned that he had several default warrants, and officers arrested him on those warrants. On arriving at the police station after his arrest, the defendant was given Miranda warnings and agreed to speak with police. After being detained in a holding cell for several hours, the defendant was brought to an interview room where, following a second set of Miranda warnings, he again agreed to speak with police and signed a Miranda waiver form. See *Miranda* v. *Arizona*, 384 U.S. 436, 444 (1966) (*Miranda*). The interview was conducted by Detective Corey Erickson, the lead investigator for the Lowell police department, and State police Trooper Kevin Baker, neither of whom had participated in the defendant's arrest.[11] At the outset of the interview, Erickson informed the defendant that he was not a suspect,[12] but that the detective believed the defendant had

---

[10]Claudio was found guilty on a theory of felony-murder as a coventurer; the defendant was found guilty as a principal.

[11]The jury heard almost the entire audiotape of the interview. A few portions of the interview, including the defendant's statement that a sample of his deoxyribonucleic acid (DNA) had been taken in prison, his statements about an earlier, unrelated crime, and his discussion of the numerous prisons in which he had been incarcerated, were redacted, as were some comments by a detective shortly before the defendant ended the interview by requesting an attorney.

[12]Police custody logs, the defendant's booking sheet, and statements by the defendant during the interview to the effect that the police had taken his shoes show that the defendant's shoes were taken at 6:40 P.M., several hours before the interview. The custody log for the shoes states that the reason for

been at the pharmacy at the time of the shooting and might have seen something that could assist with the investigation.

After responding to questions for approximately forty-five minutes, generally focused on the white automobile owned by Marquez that police had towed from the street in front of Johnson's apartment and whether "Lou" borrowed or drove it, the defendant stated, "You ask Lou that. I'm not going on with this conversation. I want a lawyer, because you keep — ask Lou that." The officers continued the interrogation for approximately three minutes,[13] then left the room in response to a knock on the door by one of the individuals observing the interview.[14]

When Erickson returned to the interview room, he said to the defendant:

> "It's 9:43 p.m. . . . [E]arlier in the conversation you had said that you wanted a lawyer when the trooper was asking you about the car, and I'm not sure if I recall correctly. It was that you said if you keep talking about the car, it's the car that was bothering you and you were getting confused with the car."

the defendant's arrest was "homicide" rather than "default warrants." Erickson testified at the hearing on the motion to suppress that the defendant was booked at 6:37 P.M. and placed in custody at 6:45 P.M., but that he did not seize the shoes until 11:16 P.M., after the defendant had become a murder suspect.

[13]Among other statements, State police Trooper Kevin Baker said, "[T]he person that owns this car says they lend it to Lou. And the part we don't understand is coincidentally it happens to be the same car that a police officer thought he saw you getting into. I'm not saying anything about trying to have you talk for Lou or say what car Lou drives."

[14]Unbeknownst to the defendant, an assistant district attorney (who was the trial prosecutor), two Lowell police officers, and a State police supervisor monitored the interview from a nearby room via cameras linked to an internal video connection. Baker testified at a hearing on the defendant's motion to suppress that one of the observers initially knocked on the door because the observer believed that the defendant had requested an attorney, and had Baker ask Erickson to step out. Baker said he had not heard the defendant say anything about an attorney, a statement the observers challenged. Erickson testified at an earlier hearing on the same motion that he had heard the defendant mention an attorney, but had not understood the defendant to mean that he wanted to end all questioning. A Lowell police officer suggested to Erickson that he should clarify whether the defendant had requested an attorney; the State police supervisor instructed Baker to do so as well.

The defendant replied, "No, because I'm willing to talk to you guys, but you keep pushing this on me. I keep telling you I don't know. . . ." Erickson responded:

> "Right. That's okay. But, I mean, what I want to do is I want to clarify right now. Okay. You can stop the tape. You do not have to talk to us, okay. I don't know if it was a situation where you just got confused and you were upset with that line of questioning. But you have to understand, okay, we are going to ask questions here that you might not like, okay, because we think one thing, and you're saying another."

The defendant then agreed to answer questions on other topics without an attorney; he was given Miranda warnings for a third time and signed another waiver form. There was no further questioning about the car until near the end of the two-hour and fifteen-minute interview.

"In reviewing a ruling on a motion to suppress evidence, we accept the judge's subsidiary findings of fact absent clear error and leave to the judge the responsibility of determining the weight and credibility to be given oral testimony presented at the motion hearing." *Commonwealth* v. *Contos*, 435 Mass. 19, 32 (2001), quoting *Commonwealth* v. *Eckert*, 431 Mass. 591, 592-593 (2000).

A suspect subject to custodial interrogation must "be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda, supra* at 479. In order for a statement made during custodial interrogation to be admitted against a defendant at trial, the Commonwealth must prove beyond a reasonable doubt that the defendant voluntarily, knowingly, and intelligently waived these rights before making the statement. See *Commonwealth* v. *Edwards*, 420 Mass. 666, 669-671 (1995), and cases cited.

The defendant argued in his motion to suppress that his waiver was not knowing and voluntary because he was undergoing heroin withdrawal at the time the statements were made. The motion judge, who was not the trial judge, did not credit this

statement. The defendant contended also that he had invoked his right to remain silent and his right to counsel when he stated, "I'm not going on with this conversation," and "I want a lawyer because you keep . . . ." On appeal, the defendant maintains that, although he invoked his rights to counsel and to remain silent approximately forty-five minutes after the interview had begun, the interview continued for another ninety minutes, and the judge erred in denying his motion to suppress.[15]

The fact of incarceration alone does not always constitute "custody" for purposes of *Miranda*. See *Maryland* v. *Shatzer*, 130 S. Ct. 1213, 1224 (2010), citing *Illinois* v. *Perkins*, 496 U.S. 292, 299 (1990). Relying on *Commonwealth* v. *Larkin*, 429 Mass. 426, 432-436 (1999), the Commonwealth argued during the hearing on the motion to suppress that the defendant had not been in custody for purposes of *Miranda* when he made the statements. The motion judge determined that the defendant had indeed requested an attorney, but that, because the defendant had not been in custody, Miranda warnings were not needed, and the statement was admissible. See *Commonwealth* v. *Larkin, supra* at 434 (test is not whether inmate is free to leave facility, but rather whether inmate "is subject to some restraint in addition to those normally imposed on him by virtue of his status as an inmate"). The judge's decision did not address the question whether the defendant had invoked his right to silence.

Before us, the Commonwealth does not press its argument that the defendant was not in custody, conceding properly that he was subject to custodial interrogation for purposes of *Miranda*, and that *Commonwealth* v. *Larkin, supra* at 432-436, is inapplicable, because the defendant was arrested specifically so that police could talk to him. Rather, the Commonwealth contends that the defendant stated only that he did not want to answer questions about the use of the white automobile, but did not unequivocally invoke his right to an attorney. See *Commonwealth* v. *Girouard*, 436 Mass. 657, 666 (2002), quoting *Commonwealth*

---

[15]The defendant and the Commonwealth do not agree as to the grounds on which the defendant sought to suppress his statement. However, the transcript of the hearing on the motion to suppress, as well as the defendant's written motion, clearly indicate that he argued the statement was made after invocation of his right to silence and his request for counsel.

v. *Judge*, 420 Mass. 433, 450 (1995) ("if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning" [emphasis in original]).

During a custodial interrogation, "[i]f the accused indicates that he wishes to remain silent, 'the interrogation must cease.' If he requests counsel, 'the interrogation must cease until an attorney is present.' " *Edwards* v. *Arizona*, 451 U.S. 477, 481 (1981), quoting *Miranda, supra* at 474. However, before making the statements, "I'm not going on with this conversation," and "I want a lawyer because you keep . . . ," the defendant had twice agreed to speak with police and signed Miranda waiver forms. "[A]fter a knowing and voluntary waiver of the Miranda rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney." *Davis* v. *United States*, 512 U.S. 452, 461 (1994). Moreover, a suspect's unwillingness to answer questions on a particular topic does not unambiguously indicate that the suspect is unwilling to continue speaking with police or obligate them to inquire whether the suspect would "like to reassert his right to silence." See *Commonwealth* v. *Robidoux*, 450 Mass. 144, 161 n.7 (2007).

We do not agree with the Commonwealth's contention that the defendant's statement, "I'm not going on with this conversation," was other than a clear invocation of his right to remain silent, or that the words, "I want a lawyer because," were "equivocal." See *Commonwealth* v. *Contos, supra* at 28 (request unequivocal where defendant said, "I think we're going to stop, and I think I'm going to get a lawyer. If this is the way that this is going, you're either accusing me or charging me"). Unlike the circumstances in *Commonwealth* v. *Girouard, supra* at 662-663, where the defendant stated, "If I am under arrest, I want an attorney," the defendant's request for an attorney was not musing out loud or wondering if he should speak to one, and was not conditioned on police intentions with regard to his arrest. As the Commonwealth conceded at oral argument, the defendant's statement of the reason why he wanted an attorney does not render the request ambiguous. Indeed, the assistant

district attorney viewing the interrogation believed that the defendant had requested an attorney and asked the officers to pause the interrogation for that reason. In addition, the motion judge concluded, based on her review of the audiotape, that the defendant had requested counsel. That the defendant ultimately ended the interview by again requesting an attorney does not render his earlier invocation of his right to counsel ambiguous.[16]

Nonetheless, while his request for an attorney was unambiguous on its face, the defendant then continued speaking, without any intervening comment or question by police. Immediately after the defendant made the statement requesting an attorney, he said, "[A]sk Lou that. Don't ask me if he borrows. Don't ask me. How do you know he borrows it? I don't know that." We agree with the Commonwealth that, in the unusual circumstances presented here — where, following the defendant's initial Miranda waiver, his invocation of the right to counsel was unambiguous, but he then appeared immediately and without police interruption to qualify the request, and to indicate that he only wanted an attorney if the officers continued questioning about the car — a reasonable interrogating officer could have been uncertain whether the defendant had invoked his Miranda rights, as the officers' interactions with the observing officers demonstrates.

The fact of reasonable police uncertainty concerning the nature and scope of the defendant's invocation, however, does not end the matter. In such circumstances, an interrogating officer must cease the interrogation, but is entitled to ask a question to clarify the defendant's intent. The question — for example, in a form such as, "I just want to be sure — do you want an attorney?" — should be brief, worded only to elicit an affirmative or negative response concerning whether the suspect wants an attorney, and should not be designed to keep the suspect talking. After such an inquiry to clarify whether a suspect has indeed requested an attorney, nothing further should be asked unless the suspect responds to the question in the negative. A

---

[16]Both interrogators testified at the hearing on the motion to suppress that the defendant's second invocation of his right to remain silent and his request for counsel had been far more emphatic. The defendant leaned forward, clapped his hands, and said, "Let's end this conversation."

suspect need not give any reason for requesting an attorney, and police may not inquire, as they did here, why a suspect is requesting one. See *Commonwealth* v. *Sarourt Nom*, 426 Mass. 152, 158 (1997) ("in ordinary circumstances there would be no proper basis for an interrogator's asking a suspect his reason for requesting an attorney"). This is so even when, as here, the defendant first volunteered such an explanation. Moreover, in seeking clarification, police may not "ignore[] the long-standing principle that 'postrequest responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself.' " *Commonwealth* v. *Hoyt*, 461 Mass. 143, 152 (2011), quoting *Smith* v. *Illinois*, 469 U.S. 91, 100 (1984).

In the present case, the questions posed by Erickson when he initially reentered the room were not clarifying. To the contrary, they appeared designed to elicit further statements by the defendant if the officers agreed not to ask about the white automobile, and that is what happened. Because the officers' questioning exceeded the narrow scope that was permitted, and intruded into the defendant's invocation of his right to counsel, we are constrained to conclude that the defendant's statements following his statement that he wanted a lawyer should have been suppressed. See *Commonwealth* v. *Hoyt*, *supra*, and cases cited.

In determining whether the erroneous admission of the defendant's statement was harmless beyond a reasonable doubt, we consider "the importance of the evidence in the prosecution's case; the relationship between the evidence and the premise of the defense; who introduced the issue at trial; the frequency of the reference; whether the erroneously admitted evidence was merely cumulative of properly admitted evidence; the availability or effect of curative instructions; and the weight or quantum of evidence of guilt." *Commonwealth* v. *Dagraca*, 447 Mass. 546, 553 (2006), citing *Commonwealth* v. *Mahdi*, 388 Mass. 679, 696-697 (1983).

The defendant never admitted to any involvement in the crime, to being present near the pharmacy, or to any knowledge of the events surrounding the shooting. Indeed, the Commonwealth maintains that the defendant's statement denying his involvement could be viewed as exculpatory. Nonetheless, we conclude that admission of the audiotape, which the jury heard virtually

in its entirety,[17] was not harmless. Admission of the statement allowed the prosecution to challenge the nontestifying defendant's credibility by showcasing Erickson's and Baker's repeated statements that they did not believe the defendant, and impinged on the jury's fact finding through numerous repetitions of the officers' belief that the defendant was guilty. See *Commonwealth v. Triplett*, 398 Mass. 561, 567 (1986), quoting *Commonwealth v. Dickinson*, 394 Mass. 702, 706 (1985) (fundamental principle that witness cannot be asked to assess credibility of his testimony or that of other witnesses).

Admission of the statement also allowed the prosecutor to introduce, contrary to the judge's ruling on the defendant's motion in limine, multiple references to prior bad acts of the defendant and additional evidence of his previous convictions. Unlike the codefendant's statement, the defendant's statement was not redacted to exclude mention of his time in prison, his refusal to "snitch," or his drug use; admission of these portions of the statement served to highlight improper evidence of the defendant's bad character, while giving the inaccurate impression that the codefendant had no similar previous history. See *Commonwealth v. Montez*, 450 Mass. 736, 744 (2008) (evidence of prior bad acts not admissible to show bad character or propensity to commit crime); *Commonwealth v. Triplett, supra* at 563, quoting *Commonwealth v. Jackson*, 132 Mass. 16, 20-21 (1882) (evidence of prior bad acts served to "divert[] the attention of the jury from the [offense] immediately before it; and, by showing the defendant to have been a knave on other occasions, create[] a prejudice which may cause injustice to be done him").

During the course of the interrogation, police stated at least thirty-nine times that the defendant was "lying," and more than fifty times that they, and an unspecified number of other witnesses, "knew" that the defendant had been at the pharmacy at the time of the shooting, or, toward the end of the interrogation, "knew" that the defendant had been the shooter. Erickson, who was not the arresting officer and was not present at the scene of

---

[17]Immediately prior to the playing of the audiotape, every juror was given a copy of a transcript of the statement, on which the juror was permitted to take notes, and which, in addition to a copy of the audiotape, was with the juror during deliberations.

the crime, stated more than fifteen times his personal knowledge of the defendant's presence at the scene of the shooting and his personal belief in the defendant's guilt. Although no bystander witness identified the defendant as the shooter or as fleeing from the scene, Erickson's questions implied also that numerous individuals saw the defendant shoot the victim.[18] See *Commonwealth* v. *Womack*, 457 Mass. 268, 272 (2010), and cases cited ("Extrajudicial accusatory statements made in the presence of a defendant, which he has unequivocally denied, are hearsay and inadmissible as evidence of guilt in the Commonwealth's case-in-chief").

In her decision on the defendant's motion in limine to suppress the statement (joined by the codefendant), the judge stated that "courtroom opinions on credibility of witnesses are excluded." She ruled also that evidence of the defendant's alleged involvement in "a prison gang that doesn't trust police and will not 'snitch' " was excluded because its probative value was "greatly outweighed by . . . prejudice," and that the only evidence of the defendant's "incarceration or arrests" that would be admitted was through Pacheco's testimony of having been incarcerated with the defendant at MCI-Concord, admitted for identification purposes. Moreover, the judge ruled that the codefendant's admissions that he had been incarcerated and that he would serve more time rather than "rat" were not admissible because they were "not probative of any material issue in the case." On these grounds alone, many portions of the defendant's statement should not have been admitted. We conclude that admission of the statement was not harmless beyond a reasonable doubt.

2. *Bruton issues.* The trial judge concluded properly that there was sufficient evidence of joint venture and that, therefore,

---

[18]In addition, the audiotape included at least fifteen references to the fact that the defendant had been incarcerated previously, twelve questions on why the defendant had run from police at the time of his arrest, thirteen references by police to "checking" the defendant's alibi with his then-boss, Eddie, and later mention that Eddie's statement did not agree with the defendant's, multiple references to the defendant's assertion that he was not a "snitch," and six suggestions by police that the defendant should neither "put it on some old guy" to provide him an alibi nor harm Eddie in any way for not having corroborated his statements.

out-of-court statements of the joint venturers made during the course of the "cooperative effort and in furtherance of its goal" could be introduced against the other joint venturers. See *Commonwealth* v. *Anderson*, 445 Mass. 195, 211 (2005), quoting *Commonwealth* v. *Colon-Cruz*, 408 Mass. 533, 543 (1990).

Following a pretrial hearing on the defendant's motion to exclude statements made by the codefendant, Claudio, to his sister, Gonzalez, shortly after the shooting, introduced through Gonzalez, the judge determined that the statements, with one exception, were admissible as having been made during the concealment phase of the joint venture. The judge ruled that Claudio's statement, "Smokey was the shooter," would be excluded because, "[u]nlike the statement that 'one of [the men] shot someone,' these words cannot be argued as advancing the purpose of the joint venture. They are self-serving and exculpatory to Claudio, are not protective of the threesome, point unequivocally to [the defendant, whose nickname is Smokey], and will run afoul of the *Bruton* rule." The defendant alleges error in the judge's decision that the remaining statements were admissible. Because the defendant did not object when the statements were introduced at trial, we review for a substantial likelihood of a miscarriage of justice.

Gonzalez testified that, while the defendant and Marquez waited in her back yard because she would not permit them to enter her house, Claudio came into her house, used her telephone, and requested a change of clothes and a towel. Gonzalez testified that Claudio said he "told him not to do it" but "he shot that kid even though." On cross-examination by both defense counsel, there were numerous repetitions, in some form, of Claudio's statement that he "told him not to do it."

"[O]ut-of-court statements by joint criminal participants are admissible against the others if the statements are made both during the pendency of the cooperative effort and in furtherance of its goal." *Commonwealth* v. *Stewart*, 454 Mass. 527, 534 (2009), quoting *Commonwealth* v. *Allison*, 434 Mass. 670, 675 (2001). The statements are considered reliable and are not deemed to be hearsay, because the statements of each joint venturer are "equivalent to a statement by the defendant." *Commonwealth* v. *Stewart*, *supra*, citing *Commonwealth* v. *White*,

370 Mass. 703, 708 (1976). This exception does not apply after the criminal enterprise has ended, but does apply during the period when "the joint venturers are acting to conceal the crime that formed the basis of the enterprise." *Commonwealth* v. *Anderson, supra* at 211, quoting *Commonwealth* v. *Angiulo*, 415 Mass. 502, 519 (1993). The inquiry to determine if a statement is made during the pendency of the joint venture "focuses not on whether the crime has been completed, but on whether a joint venture was continuing." *Commonwealth* v. *Stewart, supra* at 537, citing *Commonwealth* v. *Braley*, 449 Mass. 316, 322 (2007). "The mutual 'agency,' conceived to underlie a joint criminal venture, that justifies exposing one coventurer to the risk of being incriminated by the utterances of another . . . loses all reality when the venture collapses, and the justification disappears with it. . . . The community of activities and interests which exists among the coventurers during the enterprise tends in some degree to assure that their statements about one another will be minimally reliable . . . . When the enterprise fails, there is a dispersion of interests, and motives of self-preservation, not to speak of malice or spite, may take over." *Commonwealth* v. *White, supra* at 712.

We conclude that, like Claudio's statement that "Smokey" was the shooter, Claudio's statements that he "told him not to do it" but that "he shot that kid" similarly were not made in furtherance of a common interest, but rather to exculpate Claudio and distance himself from the acts of the other joint venturers. Unlike the statements in the car, when all three coventurers were together fleeing the scene and discussing the failed plan to rob but not shoot the victim, cf. *Commonwealth* v. *Braley, supra* at 320-321, the statement was not made to advance a common purpose, pointed to the defendant as the shooter while exculpating Claudio, and should not have been admitted. See *Commonwealth* v. *Stewart, supra* at 537 (coventurer's statement to one of his associates "was not an effort to conceal the crime; indeed, it was just the opposite. It revealed the crime to someone who was not a member of the joint venture"); *Commonwealth* v. *White, supra* at 706, 710-711 (where victim was cut with knife during armed robbery, statement by coventurer cornered by victim and friends while fleeing scene, "I didn't do it. She

did it," should have been excluded because not made in further-
ance of common goal, but rather to exculpate coventurer).
Contrast *Commonwealth* v. *Colon-Cruz*, 408 Mass. 533, 545
(1990).

Introduction of a nontestifying codefendant's extrajudicial
statement that is "powerfully incriminating" as to another
codefendant violates a defendant's right to confront the wit-
nesses against him under the Sixth Amendment to the United
States Constitution. *Bruton* v. *United States*, 391 U.S. 123, 135-
136 (1968). Such "powerfully incriminating" statements include
not only direct mention of a named codefendant, but also substitu-
tions such as use of the word "deleted" or some other symbol
in place of the codefendant's name, where the jury will realize
that the statement obviously refers to and implicates a specific
codefendant. See *Gray* v. *Maryland*, 523 U.S. 185, 194-197
(1998); *Commonwealth* v. *Bacigalupo*, 455 Mass. 485, 492-495
(2009) (jury would have inferred that reference to what "friend"
of codefendant did was reference to defendant). Testimony that
the defendant, rather than Claudio, shot the victim, despite
Claudio's urging that the defendant not shoot anyone, was
introduced through Marquez's description of Claudio's state-
ments made as the three were in the white Honda fleeing the
scene. Considered in light of Marquez's testimony, even though
Claudio's reference to "Smokey" was excluded, it would have
been obvious to the jury that the "he" Claudio was describing
to Gonzalez was the defendant. Contrast *Commonwealth* v.
*Vasquez*, 462 Mass. 427, 843-844 (2012) (statement by one of
six coventurers that "other members" were involved in decision
to kill victim did not point directly to defendant). Thus, the
statement was "powerfully incriminating" and, in these
circumstances, created a substantial likelihood of a miscarriage
of justice.

Gonzalez's testimony that Claudio said the defendant was the
shooter was critical to the prosecution's case.[19] The importance
of Gonzalez's testimony was emphasized by the prosecutor's

_____

[19]Marquez's credibility was impeached at trial on a number of grounds.
Marquez testified that he was a long-time friend of Claudio, that Claudio had
introduced him to the defendant a few weeks before the shooting, that he had
seen the defendant two or three times prior to the shooting, and that the

reference to Claudio's reported statements both in opening and closing arguments. In addition, the statements were emphasized by Claudio's counsel in his closing argument. Counsel relied on Gonzalez's statements that Claudio "told him not to" shoot anyone to maintain that Claudio attempted repeatedly to disengage from the joint venture, that Claudio was merely a "lookout," and that there was only one guilty party.

We conclude that the erroneous admission of the defendant's statement and of Claudio's statements to Gonzalez require that the defendant be granted a new trial. Nonetheless, we consider other issues to the extent that they might arise at any new trial.

3. *Issues on retrial.* a. *Codefendant's statement to police.* Claudio was arrested four days after the victim was killed. On the day after his arrest, Claudio made a statement to police, but declined to have the statement recorded. The trial judge ruled that Claudio's statement was made in the course of the concealment phase of the conspiracy and therefore was admissible substantively against both Claudio and the defendant. At trial, one of the interrogating officers testified to the content of Claudio's statement. The jury were instructed that, if they found a joint venture had existed, the coventurers' statements were admissible for all purposes.

When Claudio made his statement, both Marquez and the defendant had been arrested for their involvement in the killing. Claudio's statement that "[e]ven if he had only been involved in a robbery," he knew he was going to jail for a "long time," did not further the common interests of the joint venturers, but, rather, tended to point to others as responsible for the shooting.[20]

defendant was not his friend. He testified that during his first interview with police he had talked freely, that Claudio had threatened him after his first interview, and that he then gave police another statement that "was a lie." He stated further that he had lied "repeatedly throughout the investigation." Marquez testified also that, while he had not been given any specific promises in terms of a sentence on the charge of accessory before the fact to armed robbery, he was hoping for mercy, and he believed his sentence would be reduced depending on how he testified. In these circumstances, Gonzalez's testimony, supporting Marquez's description of the events in the car, was critical to the Commonwealth.

[20]Likewise, Marquez's statements to police were also apparent efforts to exculpate himself and to cast blame on his coventurers rather than to pursue a common goal of concealing the joint venture from police.

Based on the contents of the statement alone, it would appear that, by the time Claudio spoke to police, the joint venture had ended. Moreover, we have said that, once a joint venturer has been apprehended, the criminal enterprise has ended. See *Commonwealth* v. *Colon-Cruz, supra* at 543, citing *Commonwealth* v. *Drew*, 397 Mass. 65, 71 (1986). Therefore, the judge erred in concluding that Claudio's statement was admissible against the defendant because it was made during the pendency of the joint enterprise. See *Commonwealth* v. *Bongarzone*, 390 Mass. 326, 340 & n.11 (1983), citing *Commonwealth* v. *White, supra* at 708-712 ("Confessions or admissions of conspirators or joint venturers, made after the termination of the conspiracy or joint venture, are not admissible . . . as vicarious statements of the members of the conspiracy or joint venture").

b. *Substantive admission of grand jury testimony.* The defendant maintains, accurately, that grand jury testimony by Gonzalez that the defendant had a gun tucked in his waistband when he, Claudio, and Marquez arrived at her house was admitted substantively after Gonzalez testified that she could not remember seeing the defendant with a gun, and still could not remember seeing the defendant with a gun after the prosecutor attempted to refresh her recollection with her grand jury testimony.

Grand jury testimony is admissible as substantive evidence at trial in limited circumstances. See *Commonwealth* v. *Stewart*, 454 Mass. 527, 533 (2009). When a trial witness offers testimony that is directly inconsistent with that witness's testimony before the grand jury, the inconsistent grand jury testimony may be introduced substantively if certain foundational requirements, see *Commonwealth* v. *Daye*, 393 Mass. 55, 73-74 (1984), are met. *Commonwealth* v. *Cong Duc Le*, 444 Mass. 431, 435-442 (2005). Absence of memory when testifying at trial, where the witness had a prior recorded memory, is not, however, evidence of an inconsistent statement. *Commonwealth* v. *Martin*, 417 Mass. 187, 197 (1994). Here, Gonzalez's statement, which was admitted substantively and without limitation, might have been admissible as a prior inconsistent statement had the judge found that Gonzalez's lack of memory was feigned. See *Commonwealth* v. *Sineiro*, 432 Mass. 735, 742 (2000). The judge made no such finding. Thus, after the efforts at refreshing her memory were

unsuccessful, Gonzalez's statement about the gun should not have been admitted.

c. *Prior bad acts.* i. *Pacheco's testimony on prior convictions.* The Commonwealth moved in limine to introduce evidence that Pacheco knew the defendant when they were both incarcerated at MCI-Concord.[21] After a hearing at which the prosecutor rejected the defendant's offer to stipulate that the two were in prison together, the judge allowed the Commonwealth's motion. Pacheco testified that he knew the defendant "up in Concord" in 2001, and that they were there for a brief time together. The Commonwealth then sought to introduce the defendant's prison records to show that the defendant was indeed incarcerated at Concord during the relevant period. Defense counsel offered a more detailed stipulation than he had previously, that the defendant and Pacheco were in prison together, in the same prison but not the same unit, for approximately one month. The prosecutor rejected the offer and the judge allowed the evidence, over the defendant's objection.

Pacheco's identification of the defendant was not contested. Pacheco testified that he had purchased heroin from the defendant "three or four times" in the months prior to the shooting and that the defendant had introduced him to the victim when the defendant did not have any heroin to sell. He also described the defendant as "a good friend." The evidence of drug purchases was four years closer in time to the events of the July, 2005, shooting than the period of incarceration in 2001. Thus, Pacheco's testimony concerning the defendant's prior convictions was cumulative of other evidence and had little probative value.

Pacheco's testimony that he knew the defendant in prison was emphasized by the prosecutor in both her opening and closing arguments; the thrust of her arguments included not only the defendant's incarceration, but that the defendant was a drug user and drug dealer. Additionally, the prosecutor's opening

---

[21]As with certain portions of the trial transcript, multiple days of which are missing some sections, the transcript of that hearing is not available, although there is a transcript of a sidebar discussion and the judge's ruling immediately before the testimony. Additionally, some of the transcript volumes are numbered and dated incorrectly. See Mass. R. A. P. 8 (b) (2), as amended, 437 Mass. 1602 (2002); Mass R. A. P. 8 (b) (4), as appearing in 397 Mass. 1229 (1986). See also *Charpentier* v. *Commonwealth,* 376 Mass. 80, 86-87 (1978).

statement described police efforts, testified to by police officers, to produce a photographic array for Pacheco based on prison records. None of this testimony should have been admitted. On retrial, a stipulation such as offered by the defendant should suffice.

ii. *Altercation with Johnson's former boy friend.* The jury heard testimony that, on the day before the shooting, Claudio and the defendant went to visit Johnson's former boy friend, because the boy friend had "disrespected" Claudio, and, when an argument between the boy friend and Claudio became heated, the defendant punched the boy friend in the stomach. On the day of the shooting, Claudio, the defendant, and Marquez returned to the boy friend's house, at Claudio's request, to "make peace." None of this testimony was relevant to the events of the shooting, a motive for the shooting, or the credibility of a witness. It served merely to paint the defendant as a violent person of bad character, see *Commonwealth* v. *Barrett*, 418 Mass. 788, 793 (1994), and should not be admitted on retrial.

d. *Third-party culprit evidence.* The trial judge denied the defendant's motion in limine to allow a third-party culprit argument with respect to Thomas Clermont. The judge concluded that there was no "direct" evidence against Clermont, and the circumstantial evidence was "attenuated." See *Commonwealth* v. *Silva-Santiago*, 453 Mass. 782, 800-801 (2009) ("feeble third-party culprit evidence poses a risk of unfair prejudice to the Commonwealth").

A defendant "has a constitutional right to present evidence that another may have committed the crime." *Commonwealth* v. *Keohane*, 444 Mass. 563, 570 (2005), citing *Commonwealth* v. *Jewett*, 392 Mass. 558, 562 (1984). See *Commonwealth* v. *Buckman*, 461 Mass. 24, 30-32 (2011), cert. denied, 132 S. Ct. 2781 (2012). Where "the defense offers its own theory of the case (beyond merely putting the government to its proof), its evidence must have a rational tendency to prove the issue . . . raise[d], and the evidence cannot be too remote or speculative." *Commonwealth* v. *Keohane, supra* at 571, quoting *Commonwealth* v. *Rosa*, 422 Mass. 18, 22 (1996). If, "in the judge's discretion, 'the evidence is otherwise relevant, will not tend to prejudice or confuse the jury, and there are other "substantial connecting

links" to the crime,' " *Commonwealth* v. *Silva-Santiago, supra* at 801, quoting *Commonwealth* v. *Rice,* 441 Mass. 291, 305 (2004), "[a] defendant may introduce evidence that tends to show that another person committed the crime or had the motive, intent, and opportunity to commit it," *Commonwealth* v. *Smith,* 461 Mass. 438, 445 (2012), quoting *Commonwealth* v. *Silva-Santiago, supra.*

Here, two witnesses identified Clermont, said by Marquez to be a "friend" of Claudio's, as being at Gonzalez's house shortly after the shooting, and as leaving with the towel-wrapped gun that Clermont described as "my biscuit." A number of witnesses testified that four people, not three, were seen running near the location where the victim fell, at the same time that Marquez was seen by another witness in a car parked in her driveway, and some witnesses testified that Hispanic individuals fled the scene in two different automobiles. Clermont owned a 1990 white Honda Civic, similar to the one witnesses saw fleeing the scene; Claudio and Clermont left Gonzalez's house in that vehicle after the defendant left with Marquez.

Clermont was questioned by police shortly after the shooting; he invoked his right to counsel and his right to remain silent, and did not make any statement. During the same period, police also went to Clermont's apartment, in an attempt to locate the gun; they left without searching the apartment. Police later stated that they did not search for the gun because, in such a small apartment, and given the young children also living there, Clermont would not have hidden a gun in the apartment.

The evidence of Clermont's involvement was not speculative, attenuated, or remote. There was sufficient evidence for the defendant to have offered a third-party culprit defense that Clermont was the third party. "In general . . . the standards [applicable to closing arguments] are the same for prosecutor and defense counsel." *Commonwealth* v. *Murchison,* 418 Mass. 58, 69 (1994). "Counsel may argue from the evidence," *Commonwealth* v. *Earltop,* 372 Mass. 199, 205 (1977) (Hennessey, C.J., concurring), and "[c]ounsel has the right to argue inferences from the evidence favorable to his case . . . ." *Commonwealth* v. *Palmariello,* 392 Mass. 126, 132 (1984), quoting *Commonwealth* v. *Nordstrom,* 364 Mass. 310, 315 (1973). The

due process guarantee of the Fourteenth Amendment to the United States Constitution requires that the Commonwealth "take steps to assure that the defendant has a fair opportunity to present his defense." *Ake* v. *Oklahoma*, 470 U.S. 68, 76 (1985). On retrial, the defendant should be permitted to make this argument.

*Conclusion.* The judgments are reversed and the verdicts set aside. The case is remanded to the Superior Court where the defendant is to receive a new trial in accordance with this opinion.

*So ordered.*