## COMMONWEALTH vs. RAMON SANTANA.

Hampden. September 7, 2012. - May 29, 2013.

Present: IRELAND, C.J., CORDY, GANTS, DUFFLY, & LENK, JJ.

*Homicide. Armed Assault with Intent to Murder. Assault and Battery by Means of a Dangerous Weapon. Armed Home Invasion. Firearms. Constitutional Law,* Admissions and confessions, Voluntariness of statement, Waiver of constitutional rights, Assistance of counsel, Witness, Identification. *Due Process of Law,* Assistance of counsel, Disclosure of evidence, Identification. *Evidence,* Admissions and confessions, Admission by silence, Disclosure of evidence, Identification. *Practice, Criminal,* Motion to suppress, Admissions and confessions, Voluntariness of confession, Waiver, Assistance of counsel, Arraignment, Disclosure of evidence, Identification of defendant in courtroom, Capital case. *Search and Seizure,* Inventory. *Waiver. Identification.*

Discussion of standards of review of motions to suppress statements to police and claims of ineffective assistance of counsel premised on failure to seek suppression of such statements. [279-280]

At a murder trial, there was no error in the admission of the defendant's statements made to police after he had invoked his right to counsel, where he had done so only for the limited purpose of "signing" any statements, and where his statements were freely, intelligently, and voluntarily made. [280-281]

At a murder trial, no substantial likelihood of a miscarriage of justice arose from the erroneous admission of the defendant's statement, ending his conversation with the police, that he could not say any more. [281-283]

At a murder trial, no substantial likelihood of a miscarriage of justice arose from the erroneous admission of the defendant's repeated denials of guilt made to a police officer after he had invoked his right to remain silent, where, given the overwhelming evidence against him, their admission did not influence the jury or had but very slight effect. [283-284]

At a murder trial, there was no error in the admission of the defendant's oral statements made to police eleven days after he had invoked his right to silence and ended a previous interrogation, in that he had been given officers a second set of Miranda warnings before making the statements, told the officers that he understood his rights, signed the waiver cards stating that he understood those rights, and affirmatively agreed to speak with police. [284]

At a murder trial, there was no error in the admission of the defendant's written statement given to police eleven days after he had invoked his right to counsel for the purpose of "signing anything," in that evidence supported the judge's finding that while the defendant was being transported by police from another State, he offered, unprompted and unsolicited, to make a formal statement. [284-285]

At a murder trial, Miranda waiver cards signed by the defendant were properly admitted. [285-286]

Suppression was not required of the statements made to police by a criminal defendant, who was arrested in another State, on the ground of unreasonable delay in his arraignment in violation of the six-hour safe harbor period, in that the judge properly concluded that Massachusetts police and the out-of-State police were not acting in concert in delaying the defendant's arraignment [286-288], and in that the judge properly found that the delay of four business days by Massachusetts police in retrieving the defendant from the other State was not unreasonable, and the period the defendant was held in the other State had no effect on his freely made decision to speak with Massachusetts police [289].

At a murder trial, the defendant was not prejudiced by the prosecutor's failure timely to disclose an inability to identify the defendant by the Commonwealth's key witness, where the judge took immediate and strong corrective action, the jury heard testimony immediately following the improper identification that the in-court identification the key witness had made was not in fact independent but had been made only after another witness had explained to him where the defendant was sitting, and on cross-examination defense counsel had been able to elicit that the key witness had practiced his testimony with the prosecutor and with the other witness; and where the other identification evidence against the defendant was extensive and the evidence as a whole was overwhelming. [289-294]

At a murder trial, counsel's failure to move to suppress a pawn ticket and a gold chain that were part of the defendant's already-inventoried property following his arrest by out-of-State police did not constitute ineffective assistance where, even assuming that the seizure of the pawn ticket violated the defendant's inventory search rights, and that a warrant should have been obtained before the ticket was set aside as evidence and thereby seized, it would have made no difference for the defendant, in that there was ample other evidence concerning the chain. [294-296]

INDICTMENTS found and returned in the Superior Court Department on March 7, 2000.

The cases were tried before *Daniel A. Ford*, J., and a motion for a new trial, filed on July 21, 2009, was heard by him.

*David J. Nathanson* (*Dan A. Horowitz* with him) for the defendant.

*Jane Davidson Montori*, Assistant District Attorney, for the Commonwealth.

LENK, J. In February, 2001, a Superior Court jury convicted the defendant on two indictments charging murder in the first degree on theories of deliberate premeditation, extreme atrocity or cruelty, and felony-murder. The jury also found the defendant guilty of armed assault with intent to murder, armed robbery, assault and battery by means of a dangerous weapon, armed

home invasion, and possession of a firearm without a license.[1]
The defendant appeals from his convictions and from the denial
of his motion for a new trial.

The defendant claims that the admission of his oral and writ-
ten statements to police on January 12 and January 24, 2000,
violated his rights under the Fifth, Sixth, and Fourteenth Amend-
ments to the United States Constitution and art. 12 of the Mas-
sachusetts Declaration of Rights, and that the statements should
have been suppressed; that the prosecutor's failure timely to
disclose that a key witness had been unable to identify the
defendant at voir dire violated his right to due process and man-
dates a new trial; and that the admission of evidence obtained
by Massachusetts police based on a pawn ticket that had been
seized by New Jersey police after the defendant's arrest in that
State violated his rights under the Fourth Amendment to the
United States Constitution and art. 14 of the Massachusetts
Declaration of Rights and requires a new trial.

We reject the defendant's claims, and, after review of the
entire record pursuant to our responsibility under G. L. c. 278,
§ 33E, decline to exercise our power to reduce the defendant's
murder convictions to a lesser degree of guilt or to order a new
trial.

*Facts.* We summarize the facts the jury could have found,
reserving some details for discussion in connection with the
specific issues raised.

Gregory Cantela, Sr.,[2] and his friend, Abraham Candelario,
were found shot to death in Gregory Sr.'s apartment in Holyoke
on January 3, 2000. They had been sitting on sofas in the living
room playing a PlayStation video game when they were shot in
the head at close range;[3] the game controllers were still in their
hands when they were found, but the cover of the game system
connected to the television was open and the game was missing.
The bodies were discovered by Gregory Sr.'s seven year old

---

[1]An indictment charging another firearms offense was dismissed by
agreement.

[2]Because two of the victims share the same name, we refer to them by their
first names and the appropriate suffix. We also refer to the seven year old
brother of the third and younger victim by his first name.

[3]Gregory Sr. was shot three times, and Candelario was shot twice, with the
same revolver; Gregory Jr. was also shot with that weapon.

stepson, Edrike Roman, when he returned home from school. Edrike also found his four year old brother, Gregory Cantela, Jr., covered with blood, but conscious and crying, on the living room floor. Gregory Jr. had been in his bedroom watching a movie when he was shot in the neck and chest.[4] He called out for his father, who did not respond, and then rolled and dragged himself to the living room, where he saw his father apparently asleep. Gregory Jr. told Edrike that his father's friend "Rev," who had come over earlier and had been watching Gregory Sr. and Candelario play a video game, shot him.

Edrike picked up Gregory Jr. and carried him into the hallway, but could not carry him any further. He asked his friend Louie, who had been waiting to play with him after school and who was in the hallway outside the apartment, to get Louie's mother, Maritza Mattei. While Mattei was attempting to comfort Gregory Jr. until medical help arrived, Gregory Jr. told her, "My father's friend shot my father, and he shot my father's friend, and he hit me in the face with the gun;" Mattei said the friend's name sounded like "Riv."[5] When paramedics arrived, within a few minutes of Mattei's 911 call, Gregory Jr. begged paramedics, "Don't let him shoot me again." When asked, "Who did this to you?" he replied either that "Rev" or "Reb" had shot him.[6]

As Gregory Jr. was being transported to a hospital, the boys' mother, Elizabeth Garcia, telephoned from work; she had tried to reach Gregory Sr., whom she usually spoke with at lunchtime, several times that afternoon, but no one had answered. Edrike asked her to come home right away because Gregory Sr. and Candelario were dead and Gregory Jr. had been injured. He told Garcia that Gregory Jr. said that "Rev" shot him. When Garcia arrived home, she told police that "Rev" was a friend of her husband, and that she had known "Rev" for about five years.

[4]The four wounds to Gregory Jr.'s neck and chest were all caused by a single bullet.

[5]Mattei had some difficulty with English at the time of the shooting. In her statement to police, she said she thought the friend's name was "Rick"; at trial, she testified that she was sure the name began with an "R," but it could also have been "Rev" or "Rick."

[6]The senior paramedic on scene, who was treating the other victims in the living room adjacent to the hallway, and was the only paramedic to testify at trial, was not sure if he heard Gregory Jr. say the name "Rev" or "Reb."

She went to the police station where she identified a photograph of the defendant as the person she knew as "Rev," and drove with police to several locations where "Rev" might be found.

Gregory Jr. suffered multiple wounds to his neck and chest as a result of a single gunshot. On the day after the shooting, a State trooper and a Holyoke police officer spoke with Gregory Jr. at the hospital; he told the officers that "Rev" shot him. The officers spoke with Gregory Jr. again on January 20, 2000, at another hospital where he had been transferred for rehabilitation. He identified a photograph of the defendant as the person who shot him, circled the photograph, and wrote his name on it.

The day after the shooting, Garcia asked police about a gold chain that she had given Gregory Sr. as a birthday gift and that he wore every day; he had been wearing it when she left for work on the morning of the shooting. The chain was missing from her apartment and had not been returned with Gregory Sr.'s effects. Garcia described its distinctive "Cuban link" style and, on January 20, drew a picture of the chain, which police were unable to locate.

On the afternoon of the shooting, the defendant had planned to meet his sister Angelica Cruz outside a restaurant, and then to go shopping at a local mall; they had agreed to meet at 1:30 P.M., but the defendant was twenty minutes late.[7] When they met, the defendant asked Cruz, who was with her young son, if she knew anyone in the area because he needed to use a bathroom. Cruz brought him to a friend's house, where the defendant spent approximately fifteen minutes in the bathroom, then used it twice more before he and Cruz left. At the mall, the defendant bought Nike brand sneakers, put them on, and threw away the boots he had been wearing. He bought toys for Cruz's son, clothing for his daughter, picture frames for Cruz, and a black, "puffy" coat for himself, paying in cash. While they were in the toy store, the defendant gave Cruz two used PlayStation video games. The defendant, Cruz, and her son ate in the food court and took pictures of themselves in a photo booth.

---

[7] A shopper at a neighborhood grocery store a few minutes from the Cantela-Garcia apartment was in the store when the defendant entered, shortly after 1 P.M., and asked if the store sold bags. When he was told that it did not, he left. The shopper identified the defendant from a photographic array.

They then took a bus home, stopping en route to shop for groceries.

The defendant was unemployed at the time, had been using cocaine extensively in the previous weeks, and owed his drug connection several thousand dollars; because of the outstanding debt, the "connect" was refusing to supply the defendant with any more drugs. A few days before the shooting, the defendant had tried to sell a video game system to one of his friends for $500, saying he needed the money for a lawyer. In late December, the defendant and two acquaintances had seen Gregory Sr., who was believed by a number of his friends and acquaintances to be selling drugs, in his apartment with a large quantity of cash. Gregory Sr. was known generally to have cash readily available.

When Cruz and the defendant returned home, their mother told Cruz that the police had been looking for the defendant, and that he had to leave. Taking only the backpack that he had been carrying throughout the day, the defendant walked to a friend's house; she declined to allow him to spend the night, but permitted him to telephone for a taxicab. The defendant took the taxicab to the bus station in Springfield, where he took a bus to New York City. His sister Yvette Negron found him sleeping on the couch in her apartment on the morning of January 4. The defendant was wearing a large gold chain. When she told him that a warrant for his arrest had been issued, he said that he "didn't do it" and wanted to turn himself in to "clear . . . up" the warrant. He left the next day.

On January 5, the defendant arrived at the home of a childhood friend, Daniel Cotto, in Jersey City, where he stayed until his arrest the following week. The two stayed up late, drinking beer, smoking marijuana, and playing video games. The defendant was wearing a gold chain, with a distinctive gold religious medallion, that Cotto had never seen before. The defendant later said that he needed money and planned to pawn the chain; the day after he said this, he stopped wearing the chain.

After he had been at Cotto's apartment for a few days, the defendant told Cotto that he had "shot two dudes" named "Abraham and Greg" in Massachusetts, and that he had to "get out." He said that he had shot each at least twice in the head, and

showed Cotto an ammunition clip to prove that he was not making it up. The defendant also said that he had to return to Massachusetts to kill the sole witness, "Joseph." He asked Cotto if he could have Cotto's Social Security card as identification so that he could go to Puerto Rico. When Cotto declined, the defendant asked Cotto to take identification from Cotto's brother-in-law, who lived in the same building; Cotto again refused.

*Postarrest statements.* On January 12, 2000, after receiving information that the defendant might be at that address, Jersey City police officers arrested the defendant on a fugitive from justice warrant in the street outside Cotto's apartment. The defendant was taken into custody at approximately noon and brought to a police station, where officers contacted police in Massachusetts. Massachusetts State Troopers George Beaupre and Ronald Gibbons and Detective Emil Morales of the Holyoke police department left Massachusetts early that afternoon and arrived at Jersey City police headquarters at approximately 6:15 that evening to interview the defendant. Details of the interview process and the defendant's oral statements were introduced at trial through testimony by the State troopers;[8] his written statement was read by Gibbons, who also testified concerning the making of the statement and its contents. The statement was admitted in evidence.

The interview began at 6:43 P.M. Beaupre advised the defendant that the officers were there because of two murders and an attempted murder in Holyoke, and that warrants had issued for the defendant's arrest on those charges. Beaupre told the defendant that he would be reading him his Miranda rights. Handing the defendant a Miranda waiver card, Beaupre asked if he was able to read English. The defendant replied that he could, and that he "knew his rights." Beaupre responded that he would read them anyway and the defendant could read along if he chose. Beaupre read aloud from his copy of the card, asking the defendant to initial each line if he understood that right, and to let Beaupre know if he did not understand. The defendant initialed each line as it was read. Beaupre then asked if the defendant

---

[8]The interviews on January 12 and 24, 2000, which took place before this court's decision in *Commonwealth* v. *DiGiambattista*, 442 Mass. 423, 447-449 (2004), were not recorded.

wished to speak with the officers. He replied, "I will talk to you, but I'm not signing anything without a lawyer." Beaupre asked the defendant to sign the last line of the card, indicating that he understood the rights. The defendant signed the card at 6:43 P.M., then added, "I'm not signing anything else."

The defendant proceeded to answer questions for several hours. Initially, he said that he knew about the murders in Holyoke, but that he had been in New York or New Jersey since September. After officers confronted him with information that he had been in Massachusetts on the day of the shootings, the defendant said that he had been with his sister, had gone to the mall with her, then left for New York by bus. He continued to change his story as officers informed him in greater detail of information they had obtained from other sources. Around 10 P.M., there was a half-hour break so that the defendant could eat some takeout food that had been ordered for him.

Sometime between 12:30 and 12:45 A.M., when the defendant asked how Cruz was doing, Beaupre replied that she was worried about him, and that she had spoken with officers because she would "rather see [the defendant] locked up, so I can see him, talk to him, and write to him. He would still be here with the family," rather than dead on the street. The defendant broke down sobbing uncontrollably "for five or six minutes," then said that there had never been any "bad blood" between himself and Gregory Sr., and that "what's right on the street isn't always right." After approximately five minutes, he said that he could not "say any more," that there was nothing else to say. Beaupre and Gibbons left the room, and Morales, who had known the defendant since childhood, stayed with him and engaged him in what the motion judge termed "conversation." The defendant continued to speak, saying repeatedly that he "didn't do it." Fifteen or twenty minutes later, when Beaupre and Gibbons returned, the defendant said that he could not "say anything more." The interview ended.

The defendant was arraigned in Jersey City on the fugitive from justice warrant on January 13. On January 18, he agreed to waive rendition, and, on January 24, at approximately 6 P.M., Beaupre, Gibbons, and Morales arrived to pick up the defendant from the Hudson County jail. As the cruiser was leaving the

sally port, Beaupre again read the defendant the Miranda rights, and asked him to sign a Miranda waiver form. The defendant initialed and signed the form without any mention of obtaining counsel or not signing anything. The defendant then said that he was willing to speak with the officers. He answered questions for approximately one hour, appearing "eager" to talk. In Darien, Connecticut, the officers stopped at a fast food restaurant for dinner. They did not discuss the case while eating. After dinner, the defendant said, "I will say the whole story, I will give a statement, but I want to collect my thoughts." There was no further questioning during the remainder of the trip.

They arrived at the Holyoke police station at approximately 10 P.M. Saying that he wanted "to get it done," the defendant asked to make a statement before being booked, so that he could sleep. He was brought to a room in the detectives' area, where the officers removed his handcuffs. He sat next to Gibbons so that he could read the computer screen. Gibbons typed as the defendant spoke; a number of times, Gibbons had to ask the defendant to slow down so that he could enter everything accurately. Shortly before 1 A.M., Gibbons printed the statement. The defendant reviewed and initialed each page, indicating written changes on several pages, and asking Gibbons to initial the changes. This review took one hour and six minutes. The defendant signed the statement at 1:58 A.M.[9]

*Prior proceedings.* The defendant filed a motion in limine before trial that sought to suppress both the January 12 and January 24 statements. The motion was denied after an evidentiary hearing by the judge who presided at trial. The defendant

---

[9]In his written statement, the defendant said that he had gone to the Cantela apartment to warn Gregory Sr. about a planned robbery by two mutual acquaintances, and found the two victims in the living room, dead. He took the chain from around Gregory Sr.'s neck because Gregory Sr. had no further use for it. He took the video games from the PlayStation console and put them in his pocket; he was not sure why. He found Gregory Jr. in his bedroom, lying on the floor facing the wall, with a gunshot wound in his back, moving but unable to talk. The defendant's gun, which had been stolen by one of the two mutual acquaintances several months earlier, was on the floor next to Gregory Jr.. He had another gun with him, which he was holding because he thought the shooters might still be in the apartment, and which Gregory Jr. saw. He told Gregory Jr. that his "daddy went bye bye," then left before police found him holding the guns. He threw out the guns in one of the trash cans at the mall.

did not raise any further objection to admission of his statements, and, indeed, himself introduced certain portions.

After the defendant was convicted in February, 2001, he timely filed his direct appeal, but the appeal did not proceed. In 2007, new appellate counsel was appointed and, in July, 2009, filed a motion for a new trial. In November, 2009, the motion judge, who was also the trial judge, conducted a nonevidentiary hearing, and determined that an evidentiary hearing was necessary. An evidentiary hearing was held in March, 2010. The judge then allowed the parties time to speak by telephone with the Jersey City officers, who were unable to travel to Massachusetts. An agreed-to statement of testimony that would have been given had the New Jersey officers appeared was submitted. The judge thereafter denied the defendant's motion. The appeal from that denial was consolidated with his direct appeal.

*Discussion.* The defendant maintains that his oral and written statements to police should have been suppressed due to a number of violations of his rights to counsel and to remain silent. Some of these grounds were asserted in his motion in limine and others were raised through an ineffective assistance of counsel claim in his motion for a new trial. He claims also that a new trial is required due to the prosecutor's delayed disclosure that Gregory Jr. had been unable to identify the defendant as "Rev" after the court room voir dire. The defendant argues further that his trial counsel was ineffective for failing to move to suppress the pawn ticket seized from him on the day of his arrest and the gold chain subsequently seized from the pawn shop.

1. *Defendant's statements to police.* The defendant pursues on appeal all of the grounds for suppression raised in his initial motion in limine, concerning violations of his right to counsel and his right to remain silent. He presses as well the issues raised in his motion for a new trial: the continued interrogation after the defendant invoked his right to silence on January 12; the admission of the defendant's statement that he had nothing more to say; the admission of the signed Miranda waiver cards after the defendant said he would not "sign[] anything" without having consulted with counsel; and asserted violations of *Commonwealth* v. *Rosario*, 422 Mass. 48, 56 (1996) (*Rosario*), on

January 12 and 24. He claims counsel was ineffective for failing to move to suppress or to object at trial to the admission of the statements on these grounds.

a. *Standard of review.* As to the claims raised in the defendant's motion in limine that violations of his rights to silence and to counsel required suppression, regardless whether renewed at trial, see *Commonwealth* v. *Whelton*, 428 Mass. 24, 25-26 (1998), we review to determine whether any error was harmless beyond a reasonable doubt. See *Commonwealth* v. *McNulty*, 458 Mass. 305, 318 (2010). "In reviewing a judge's ruling on a motion to suppress, we give substantial deference to the judge's ultimate findings, and we accept the judge's subsidiary findings unless they are clearly erroneous." *Commonwealth* v. *Burton*, 450 Mass. 55, 61 (2007), citing *Commonwealth* v. *Cunningham*, 405 Mass. 646, 655 (1989). We conclude that, even if certain portions of the defendant's statements to police were improperly admitted, any error was harmless.

As to the additional grounds for suppression raised in his motion for a new trial, we consider whether counsel's failure to raise these claims resulted in a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992). "Where a claim of ineffective assistance of counsel is raised in the motion [for a new trial], and where the appeal from the denial of the motion is heard with the direct appeal under G. L. c. 278, § 33E, as here, we review to determine whether any conduct or omission by counsel 'was likely to have influenced the jury's consideration.' " *Commonwealth* v. *Smith*, 459 Mass. 538, 550 n.7 (2011), quoting *Commonwealth* v. *Sharpe*, 454 Mass. 135, 146 147 (2009). We conclude that the defendant has not established a serious failure by counsel that resulted in a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Harbin*, 435 Mass. 654, 656 (2002).

b. *Statements on January 12.* i. *Statements after limited assertion of right to counsel.* The defendant suggests, both in his motion in limine and in his motion for a new trial, that the assertion of his limited right to counsel for purposes of "signing anything" was an invocation of his right to counsel for all purposes, or, alternatively, even if his invocation was limited, that his subsequent, uncounselled verbal statements were not

voluntary. It is clear, however, as the judge found, that the defendant invoked his right to counsel only for the limited purpose of "signing" statements. He was, as he stated, willing to "talk" to police, as he did for more than five hours. Police permissibly may continue to question a suspect who has invoked a limited right to counsel for making a written statement, provided that he is willing to speak with them without counsel. *Connecticut* v. *Barrett*, 479 U.S. 523, 529-530 (1987).

Where a defendant asserts a voluntariness objection, the Commonwealth must prove beyond a reasonable doubt that the statements were voluntarily made. See *Commonwealth* v. *Tavares*, 385 Mass. 140, 152, cert. denied, 457 U.S. 1137 (1982). "A statement is voluntary if it is the product of a 'rational intellect' and a 'free will.' " *Commonwealth* v. *Selby*, 420 Mass. 656, 662 (1995), quoting *Commonwealth* v. *Davis*, 403 Mass. 575, 581 (1988). In making this determination, we consider whether "in light of the totality of the circumstances surrounding the making of the statement, the will of the defendant was [not] overborne," but rather that the statement was "the result of a free and voluntary act." *Commonwealth* v. *Durand*, 457 Mass. 574, 595-596 (2010), quoting *Commonwealth* v. *Souza*, 428 Mass. 478, 483-484 (1998).

We are satisfied that the defendant's statements were freely, intelligently, and voluntarily made. The defendant spoke in a relaxed fashion with police, one of whom was a childhood friend. He gave different versions of his story, unprompted, as he learned more about what police knew. He spoke with the Massachusetts officers in what was described by the New Jersey officers, who were not part of the interrogation but were present in the room, as a "pleasant" and "conversation[al]" style. There was no error in allowing admission of the oral statements the defendant made after having invoked his right to counsel for the limited purpose of "signing anything."

ii. *Statement that defendant had nothing more to say.* The defendant asserted in his motion for a new trial that the admission of his statement that he could not say any more was a violation of *Doyle* v. *Ohio*, 426 U.S. 610, 617 618 (1976) (defendant's exercise of right to remain silent may not be admitted in evidence or commented upon).

The officers conducting the interview understood the defendant's reiterated statement as terminating the interview, but not necessarily precluding future interviews. The motion judge found that the defendant's statement that he "couldn't say any more" indicated that he did not wish to speak to the officers that night. In so finding, the judge also concluded that the statement "was not an indication of his right to remain silent *permanently*" (emphasis in original) because the defendant did not "indicate a desire to foreclose the possibility of additional interviews."[10] The defendant thus clearly invoked his right to remain silent at least for the remainder of that evening, and therefore it was error to admit it. See *Commonwealth* v. *Clarke*, 461 Mass. 336, 342 (2012), quoting *Davis* v. *United States*, 512 U.S. 452, 459 (1994) (whether defendant invoked right to silence is objective test requiring that reasonable police officer in circumstances would understand statement to be invocation). See, e.g., *Commonwealth* v. *Santos*, 463 Mass. 273, 285 (2012) ("I'm not going on with this conversation" clear invocation of right to remain silent); *Commonwealth* v. *Connolly*, 454 Mass. 808, 828 (2009) (defendant said he "did not have anything to say at that time"); *Commonwealth* v. *Chase*, 70 Mass. App. Ct. 826, 832 (2007) ("I ain't talking anymore"); *Commonwealth* v. *King*, 34 Mass. App. Ct. 466, 468 (1993) ("I don't want to talk no more").

Relying on *Commonwealth* v. *Martinez*, 431 Mass. 168, 183-184 (2000), the Commonwealth argues that, even if the defendant did invoke his right to silence, there was no *Doyle* violation because the statement was admitted not as evidence of guilt, but rather to explain the "abrupt" end to the interview. The interview, however, had lasted for almost six hours, with the defendant breaking down in tears at the end of that period. In these circumstances, it is unlikely that the jury would have thought its termination abrupt or in need of explanation. See *Commonwealth*

---

[10]The judge, who also ruled on the motion in limine, found at the hearing on that motion that the officers understood the defendant to have meant he was tired, emotionally overwrought, and could not say anything else that evening, not that he was unwilling to answer questions at some future date. The judge concluded that the defendant "had not invoked his right to remain silent permanently," because he had not "foreclose[d]" the possibility of additional interviews at some later date.

v. *DePace*, 433 Mass. 379, 384 (2001), *S.C.*, 442 Mass. 739 (2004), cert. denied, 544 U.S. 980 (2005). In any event, even if the statement were understood only as a request to terminate questioning for the evening, it should not have been admitted. See *Commonwealth* v. *Beneche*, 458 Mass. 61, 75 (2010) ("Even if legally insufficient to stop police questioning, testimony regarding a defendant's statements about his desire not to speak with police may suggest to the jury that the defendant is guilty simply because he chose to exercise his constitutional right to silence, and accordingly we have held it inadmissible"). However, the prosecutor did not refer to the statement in any subsequent questioning or in closing argument, arguing instead that the interrogation ended when the defendant began to cry.[11] In the circumstances, there was no substantial likelihood of a miscarriage of justice.

iii. *Statements after defendant said he could not say any more.* In his motion for a new trial, the defendant objected to introduction of his repeated statements to Morales that he "didn't do it," after the State troopers left the room when the defendant said, "I can't say any more." Treating the defendant's statement as a limited invocation of his right to remain silent for that night, the motion judge characterized the ongoing interview by Morales as "conversation," concluding that, because he was not convinced that it was "interrogation," there was no error. To the extent that the defendant had invoked his right to silence, however, the police were bound to "scrupulously honor[]" that invocation, see *Commonwealth* v. *Clarke, supra* at 343, quoting *Michigan* v. *Mosley*, 423 U.S. 96, 104 (1975), and all conversation with the defendant should have ceased. See *Commonwealth* v. *Clarke, supra.*

However, in this context, the admission of the defendant's repeated denials of guilt did not result in a substantial likelihood of a miscarriage of justice. "The jury were able to hear evidence of his prompt, clear, and emphatic denials without his having to testify, something generally of great value to defend-

---

[11]Officers testified that the defendant began to cry after they told him that Cruz was worried about him and they described her statement to him. Portions of Cruz's statement were also introduced by the defendant on cross-examination of Beaupre and Gibbons, who testified after Beaupre.

ants." *Commonwealth* v. *Womack*, 457 Mass. 268, 276 (2010). Given the overwhelming evidence against the defendant, admission of his statements of denial "did not influence the jury, or had but very slight effect." *Commonwealth* v. *Diaz*, 453 Mass. 266, 275 (2009), overruled on another ground, *Commonwealth* v. *Womack*, *supra* at 274, quoting *Commonwealth* v. *Gilday*, 382 Mass. 166, 178 (1980).

c. *Statements on January 24.* i. *Statements in police cruiser.* In his motion in limine, the defendant maintained that his statements in the police cruiser on January 24 should not have been admitted because they were obtained after his invocation of the right to silence on January 12.

Even if the defendant had intended on January 12 to invoke his right to silence permanently, rather than simply to end questioning for the evening, the statements were admitted properly. See *Michigan* v. *Mosley*, *supra* at 105-106. There was a lapse of eleven days between interrogations. The defendant was given a second set of Miranda warnings on January 24 before he made any statement. He told the officers that he understood his rights, signed the waiver cards stating that he understood those rights, and affirmatively agreed to speak with police. He made no reference to his statement on January 12 that he would not sign anything without a lawyer, or to an invocation of a right to silence. The officers all testified that the defendant appeared willing, even "eager" to talk, and spoke freely and at length in response to questions. See *Commonwealth* v. *Woodbine*, 461 Mass. 720, 730 (2012); *Commonwealth* v. *Rivera*, 424 Mass. 266, 269 (1997), cert. denied, 525 U.S. 934 (1998).

ii. *Written statement.* The defendant argued in his motion in limine that his written statement on January 24 was obtained after his invocation of the right to counsel for "signing anything" on January 12, and thus was introduced in violation of *Edwards* v. *Arizona*, 451 U.S. 477, 482 (1981) (if defendant requests attorney, questioning may not be resumed without attorney present). See *Minnick* v. *Mississippi*, 498 U.S. 146, 156 (1990) (where police initiated interrogation after defendant requested counsel, statement must be suppressed). However, questioning may be resumed after an invocation of the right to counsel if the conversation is initiated by the suspect. *Edwards* v. *Arizona*, *supra* at 484-485.

All three of the officers involved in transporting the defendant from New Jersey to Massachusetts testified that, after the dinner stop in Connecticut, the defendant offered, unprompted and unsolicited, to make a formal statement. Notwithstanding the defendant's repeated suggestions that the police officers misspoke or lied in their testimony about the defendant's statement in the police cruiser, and the circumstances of the defendant's making the written statement at the Holyoke police station, the judge, after an extensive evidentiary hearing, credited the officers' testimony. That testimony is corroborated by Beaupre's detailed and contemporaneous notes written in the police cruiser while Gibbons was driving.

The defendant's conduct at the police station evinces clearly that his written statement was voluntarily made. He requested to make the statement before booking, and gave the entire statement with virtually no prompting, at times speaking so quickly that Gibbons had to ask him to slow down. The defendant then reviewed the printed statement in "very meticulous" detail for over one hour before signing it. At no point did he mention a lawyer. There was no error in the admission of the defendant's written statement.

d. *Miranda waiver cards.* In his motion for a new trial, the defendant argued that counsel was ineffective for failing to have sought suppression of the Miranda waiver cards he signed on both January 12 and January 24, because the defendant's limited invocation of his right to an attorney for "signing anything" included the waiver cards. The judge found that, by the defendant's statement that he would not "sign anything" without an attorney, the defendant clearly meant that he would not sign a formal written statement before consulting with counsel; he was not referring to signing the cards, which he had already initialed, and which served only to indicate that he had been given the Miranda warnings. The judge concluded that counsel could not have been ineffective for failing to move to suppress the cards, a motion which the judge would have denied.

The cards were properly admitted. Signing Miranda waiver forms is an administrative act and not custodial interrogation. There is no Fifth Amendment right to counsel for administrative matters such as signing Miranda waiver forms acknowledging

that Miranda warnings have been given. *Commonwealth* v. *Clark*, 432 Mass. 1, 16 (2000). We reject the defendant's suggestion that *Commonwealth* v. *Clark, supra,* should be overturned.

e. *Whether statements were made in violation of* Rosario. In his motion for a new trial, the defendant asserts that the interrogations on both January 12 and January 24 were conducted in violation of *Commonwealth* v. *Rosario,* 422 Mass. 48 (1996), and that all of his statements should have been suppressed on that ground. The defendant contends that his January 12 oral statements should have been suppressed because the police deliberately delayed his appearance before a judicial officer in New Jersey for twenty-one hours in order to facilitate interrogation by Massachusetts police. He argues that the January 24 oral statements should have been suppressed because, after interviewing him on January 12, Massachusetts police did not resume their interrogation until January 24, despite his waiver of rendition on January 18. The judge concluded that any delay was not designed to coerce the defendant or to "wear down his resistance" to questioning; that the spirit of *Rosario* was followed; and that he would have denied any challenge to admission of the statements based on *Rosario.*

Recognizing both that police have "the duty to bring an arrested person before a court as soon as is reasonably possible," *Rosario, supra* at 51, and that "[t]he ultimate question . . . is whether the police should be allowed to delay arraignment in order to question a person who has been arrested," *id.* at 53, "this court announced a bright-line rule creating a safe harbor for the interrogation of arrested individuals prior to arraignment." *Commonwealth* v. *Siny Van Tran,* 460 Mass. 535, 560 (2011). "An otherwise admissible statement is not to be excluded on the ground of unreasonable delay in arraignment, if the statement is made within six hours of the arrest . . . , or if . . . the defendant made an informed and voluntary written or recorded waiver of his right to be arraigned without unreasonable delay." *Rosario, supra* at 56. While there are exceptions that toll the running of the six-hour safe harbor period, ordinarily the period "commences on arrest and concludes six hours later without regard to when court is in session" or when the arrest was made. *Id.* at 56-57.

This exclusionary rule serves the dual purposes of preventing unlawful detention and eliminating "the opportunity and incentive for application of improper police pressure" prior to arraignment, when the constitutional right to counsel attaches. *Id.* at 51. "[T]he principal mischief that the *Rosario* rule was adopted to prevent [is] the coercive influence of intentional delays of arraignment to prolong custodial interrogation of unwilling and uncounseled arrestees." *Commonwealth* v. *Siny Van Tran, supra* at 563, citing *Rosario, supra* at 57. "In a less direct manner, the rule, recognizing the coercive nature of a lengthy interrogation, provides the court with an additional assurance (over and above the assurance supplied by compliance with the requirements of *Miranda, supra*) that statements made by the defendant after arrest but before presentment are free, intelligent, and voluntary." *Commonwealth* v. *Butler*, 423 Mass. 517, 523-524 (1996), citing *Rosario, supra* at 51.

i. *Delay on January 12.* The defendant claims that all of his statements on January 12 must be suppressed because New Jersey police "purposefully held [him] without presentation for more than six hours" "even though they had time to take him to court," "expressly for the purpose of enabling interrogation," and in violation of the "spirit" of *Rosario*. In *Commonwealth* v. *Morganti*, 455 Mass. 388, 399 (2009), we clarified that the *Rosario* safe harbor rule "applies by its terms only to persons arrested in Massachusetts who could be arraigned in Massachusetts; it was not intended to apply to persons arrested in other States on warrants issued in Massachusetts, whose arraignment would need to await their rendition to Massachusetts." In such situations, we look to whether the out-of-State interrogation violated the "spirit" of the rule. *Id.* at 400.

The Massachusetts police could not have interrogated the defendant during the six-hour period following his arrest in New Jersey because they first needed to travel from Massachusetts to New Jersey. There is no suggestion that they delayed unreasonably in getting to New Jersey, that the Jersey City police interrogated the defendant in their absence, or that, when they arrived, the Massachusetts police interrogated the defendant for more than six hours. The defendant calls attention to the fact that the Jersey City police could have brought him to court

for presentment on the fugitive from justice warrant while await-
ing the arrival of the Massachusetts police, where he would
presumably have been afforded counsel if he so chose. Even if
the Massachusetts police requested the Jersey City police to
postpone their booking process until the Massachusetts police
could interview the defendant,[12] and, as a result, the Jersey City
police did not bring the defendant to court on January 12 as
they might otherwise have done, the judge found that neither
the Massachusetts nor the Jersey City police delayed in order to
coerce the defendant.

We agree with the judge that, in the totality of the circum-
stances, the spirit of *Rosario* was not violated. Massachusetts
police left for New Jersey promptly upon being notified of the
defendant's arrest. The judge found that "[t]he involvement of
the Jersey City police was limited to arresting the defendant on
the fugitive charge, holding him in custody, and providing facili-
ties where the Massachusetts officers could interrogate [him]."
He concluded that the Massachusetts and Jersey City police
were not "acting in concert," and that the Jersey City police
believed that their only role was to keep the defendant in custody
until Massachusetts officers arrived. See *Commonwealth* v.
*Cryer*, 426 Mass. 562, 568 n.4 (1998). Moreover, under New
Jersey law, guiding police procedures there, not only must bail
be set within twelve hours of an arrest, but any delay in doing
so does not automatically require suppression of a defendant's
statements. Application of the exclusionary *Rosario* rule would
serve no useful purpose in these circumstances.

---

[12]The judge noted that the record suggests that the Jersey City police "had
sufficient time to bring the defendant to court before 3:30" on January 12 and
found it "undisputed that the defendant was not brought to [court] to be ar-
raigned on the fugitive from justice charge until the morning of January 13."
The defendant was held in the major case unit's detective squad room pending
arrival of the Massachusetts police, where he watched television and was
provided with food and drink. The major case unit was not in the same build-
ing as the bureau of central identification (BCI), where the formal booking
process takes place. However, BCI, the major case unit, and the court house
were located within fifteen minutes of each other.

Although the Jersey City police were "requested" by Massachusetts police
"to stay with [the defendant] and make him as comfortable as possible and to
transport him to BCI when the Troopers had concluded their interview," there
is no evidence that the Massachusetts police had specific communications
with the Jersey City police concerning any court appearance that day.

ii. *Delay on January 24.* After the defendant waived rendition on Tuesday, January 18, Jersey City officers sent a notice by facsimile transmission to Gibbons stating that Massachusetts police must pick up the defendant "within [ten] days of the waiver date," and that they must do so on a day when New Jersey courts were in session, so that a judge could authorize transfer of custody to them. The officers picked up the defendant on January 24, within the time frame stated on the rendition waiver form. Trial counsel viewed a delay of four days as comparatively brief for an out-of-State rendition, as did the police officers.

The judge found that the delay of four business days in retrieving the defendant was not unreasonable. He credited the Massachusetts officers' explanations for that delay, i.e., the need to coordinate schedules between police departments, to obtain approval for travel and arrange paperwork, to set up interviews requiring the presence of New Jersey detectives while the Massachusetts officers were in New Jersey, and to devote time to other investigations for which they had responsibility. Finding that the Massachusetts officers "did not delay their trip to New Jersey until January 24 in order to gain some advantage," the judge concluded that neither the purpose nor the effect of the delay was to coerce the defendant.

Although, as the defendant argues, the Massachusetts officers also continued the investigation against him in the period between January 18 and January 24, the judge found explicitly that such investigation "was not a factor" in the defendant's decision to speak with police on January 24. To the contrary, the period during which the defendant was held in New Jersey "had no effect upon the defendant's freely made decision to speak with" Massachusetts police on January 24. We conclude that there was no *Rosario* violation, and that the January 24 statements were properly admitted.

2. *Prosecutor's delay in disclosing Gregory Jr.'s inability to identify the defendant at voir dire.* On the first day of trial, the judge conducted a voir dire to determine if Gregory Jr. and his brother Edrike were competent to testify. The defendant was present, sitting at counsel table, during the proceeding. The judge concluded that both boys were competent. At the pros-

ecutor's request, after the hearing, Beaupre asked both children if they had recognized anyone in the court room; they named several people who had been there, but did not name the defendant. After they left the court house, Gregory Jr. and Edrike both asked their mother, Garcia, whether "Rev" had been in the court room; she replied that he had. On their continued questioning, she explained that he had been sitting at counsel table next to his attorney.

Although the prosecutor learned from Beaupre shortly after the voir dire that the boys had not recognized "Rev" in the court room, he called Gregory Jr. to the stand the following day without disclosing this information to the defendant. The judge allowed the prosecutor's request that the chairs be moved in the court room so that the prosecutor could sit eight feet away from Gregory Jr. in order to make him more comfortable,[13] and allow him an unobstructed view of defense counsel table.[14] After stating that he was all done with questions, the prosecutor said, "Now Gregory, one more question . . . . [D]o you see Rev in the courtroom?" When Gregory Jr. said, "Yes," the prosecutor asked, "Where?" and Gregory Jr. pointed to counsel table. The prosecutor later stated that he was "surpris[ed]" when Gregory Jr. identified the defendant as "Rev," but he did not request a sidebar discussion or a recess in the trial proceedings prior to cross-examination. During a subsequent recess after Gregory Jr. had been excused, the prosecutor spoke with Garcia and she told him about her conversation with her sons after they left the court house on the previous day.

After Gregory Jr.'s testimony, the prosecutor first presented at sidebar a lengthy argument that Edrike's statement to his mother, recounting Gregory Jr.'s statement that "Rev" shot him, was an excited utterance. Only then did he turn to what he described as a "more problematic" issue. In introducing that issue, he asserted that he had not been expecting Gregory Jr. to identify the

[13]The judge also permitted the prosecutor's motion that the boys' mother remain in the court room during Gregory Jr.'s and Edrike's testimony, although she would be a subsequent witness.

[14]The judge suggested sua sponte that defense counsel would also be permitted to sit eight feet away if he chose; counsel said that he would not. Gregory Jr. had not met defense counsel prior to trial; by contrast, he knew the prosecutor as "Jim," and testified on cross-examination that "Jim" was his "friend."

defendant, before describing the boys' inability to identify "Rev" the previous day, and Garcia's actions.

The judge determined properly that the prosecutor erred in failing to disclose this exculpatory and material information. He concluded that the prosecutor did not act in bad faith in calling Gregory Jr. to the stand without having made such disclosure, however, because the prosecutor did not expect that Gregory Jr. would identify the defendant.[15] Over the defendant's vehement objection, the prosecutor agreed to put before the jury Gregory's inability to identify "Rev" through questioning of Garcia, the Commonwealth's next witness.[16] The judge also allowed the defendant's motion, made before Garcia testified and renewed, as instructed, after her testimony, that Gregory Jr.'s identification testimony be struck, and instructed in his charge that testi-

---

[15]We note that, in January, 2001, a few days before trial was to commence, trial was continued for approximately one month by a different judge, at defense counsel's request, because of the prosecutor's delayed disclosure of a potentially exculpatory witness. Counsel stated at the hearing, as he did in his memorandum, that, while he considered this evidence potentially the best possible defense and needed time to investigate it further, the defendant strongly opposed any continuance. The judge conducted a colloquy with the defendant, who said initially that he wanted counsel replaced because counsel had filed the motion to continue, contrary to his wishes.

The judge cautioned the prosecutor about the duty to disclose exculpatory evidence, and the potential difficulties that could arise if counsel's efforts to provide the best possible defense resulted in conflict with the defendant that irretrievably damaged the attorney-client relationship and impinged on counsel's ability to represent the defendant. Despite the prosecutor's strenuous opposition, the judge allowed the continuance, and the defendant decided to retain counsel. The prosecutor subsequently provided defense counsel with a second statement by the same potential exculpatory witness, one that had been given to police in the same month as the first statement belatedly disclosed by the prosecutor. Counsel ultimately decided not to use that evidence.

[16]Defense counsel made clear that he thought the prosecutor's belated disclosure was "appalling" and put his client at a material disadvantage. Not only would he be hard put at that point to recall the child to the stand, he contends on appeal that the prosecutor's proposed solution of eliciting the information through Garcia allowed him both to bring out the belated disclosure in a benign manner and to create the impression by so doing that he was being open and fair. Noting to the judge in apparent frustration that "down here getting discovery is like pulling teeth," defense counsel also made reference to a prior agreed-upon order requiring that such information be disclosed, and protested that this latest instance of belated disclosure admitted of no good solution. "At this point I don't know what we can do, Your Honor." See Commonwealth v. Merry, 453 Mass. 653, 665-666 (2009); Commonwealth v. Tucceri, 412 Mass. 401, 404-407, 409, 412-414 (1992).

mony which had been struck could not be considered. Immediately before closing arguments, the judge read a stipulation by the parties that Gregory Jr. had been unable to identify the defendant as "Rev" in the court room.

The defendant argues that a new trial is necessary because the late disclosure prejudicially hampered his defense. He was unable, during his opening statement, to reference Gregory Jr.'s inability to identify him, and was restricted in the arguments that he could make during closing.[17] The defendant claims also that the delayed disclosure effectively precluded cross-examination of Gregory Jr. about his earlier failure to recognize the defendant as "Rev," since it would have been counterproductive to have a small child return to the stand for cross-examination about the actions of his mother.

The Commonwealth concedes properly that the prosecutor's failure timely to disclose an inability to identify the defendant by the Commonwealth's key witness was a failure of constitutional dimension. See *Commonwealth* v. *Hill*, 432 Mass. 704, 715-716 (2000), citing *Commonwealth* v. *Collins*, 386 Mass. 1, 8 (1982). It argues, however, that cross-examination of Gregory Jr. on his inability to identify "Rev" would not have aided the defendant, because the inability could have been explained on redirect by differences in the defendant's appearance at the time of the shootings and at trial.[18] This, of course, does not lessen the Commonwealth's duty to disclose. The Commonwealth had an absolute obligation to disclose this nonidentification evidence by a key witness, and hearing from the witness rather than the witness's mother that he did not recognize Rev in the court room could have made a more powerful impression on the jury.

Notwithstanding the serious nature of the Commonwealth's failure, however, see *Commonwealth* v. *Hill*, *supra* at 715, quot-

---

[17] The judge instructed defense counsel that he could not suggest any misconduct on the part of the police or prosecution.

[18] Although their mother testified that she had seen the defendant wearing many different hairstyles, both children knew Rev as having a very large, distinctive "Afro" hairstyle. When shown a photograph of the defendant with his hair pulled back, which Garcia had identified as being a photograph of the defendant, Edrike did not identify him. Gregory Jr. subsequently identified the defendant from a different photograph, in which he wore a large "Afro." At trial, the defendant's hair was slicked back close to this head; he had also gained approximately forty pounds since the shootings.

ing *Brady* v. *Maryland*, 373 U.S. 83, 87 (1963) ("the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment"), given the circumstances, we conclude that the defendant was not prejudiced by the delay. See *Commonwealth* v. *Lam Hue To*, 391 Mass. 301, 309 (1984), quoting *Commonwealth* v. *Wilson*, 381 Mass. 90, 114 (1980) (prejudice inquiry concerns whether disclosure was "sufficiently timely to allow the defendant 'to make effective use of the evidence in preparing and presenting his case' ").

The judge took immediate and strong corrective action, and the jury heard testimony, immediately following Gregory Jr.'s improper identification, that the in-court identification he had made was not in fact independent, but was made only after his mother's explanation of where the defendant was sitting. On cross-examination, defense counsel was able to elicit that Gregory Jr. had "practiced" his testimony four times with the prosecutor, and also had practiced at home with his mother. Further, during his closing, the defendant pointed to Garcia's coaching of Gregory Jr.'s identification testimony to suggest that other portions of his testimony had been coached. See *Commonwealth* v. *Lam Hue To, supra* ("Whether and the extent to which the defendant was disadvantaged in defending himself are the pivotal issues . . . . [I]t is the consequences of the delay that matter, not the likely impact of the undisclosed evidence . . .").

Moreover, there was significant additional evidence that Gregory Jr. had identified Rev as the shooter, and the defendant as Rev, shortly after the shooting. Edrike, Edrike's friend's mother Mattei, who was the first adult to arrive on the scene, and the senior paramedic at the scene all testified that Gregory Jr. had identified "Rev" as the person who shot his father and who shot him.[19] Additionally, the photograph of the defendant that Gregory Jr. had identified while at the rehabilitation hospital, and details of that identification procedure, were introduced

---

[19]Gregory Jr.'s mother was also permitted to testify that Edrike told her that Gregory Jr. said Rev shot him. This "totem pole" hearsay should not have been admitted. The defendant objected to its admission, and the judge determined initially that the statement was inadmissible hearsay. Subsequently, he allowed its admission on the ground that Gregory Jr.'s statement was an excited utterance and thus independently admissible. This reasoning applies to

through police testimony. Put plainly, the other identification evidence against the defendant was extensive; the evidence as a whole was overwhelming. Indeed, at the new trial hearing, the judge noted the strength of the Commonwealth's case and the "difficult" circumstances thus confronting defense counsel. The late disclosure did not prejudicially hamper the defense case.

3. *Pawn ticket and gold chain.* The defendant claimed in his motion for a new trial that the pawn ticket and the gold chain seized as a result of that ticket should not have been admitted because seizure of the pawn ticket was the product of an unlawful investigatory search of his already-inventoried property.

When the officers arrived from Massachusetts to interview the defendant on January 12, 2000, his inventoried property was on a desk in the detective squad room where the defendant was seated. While Beaupre was reading the Miranda warnings, Gibbons "glanced" over at the desk and saw an unfolded receipt from a pawn shop, with the name "Jemma Loan Company" printed in large red and gold letters at the top. Gibbons observed that the ticket, in the name "Ismail Bonilla," was for a "10K chain & rel. pendant" and a "10K bracelet." Aware of Gregory Sr.'s missing gold chain, Gibbons recognized the pawn ticket as potential evidence, as did Beaupre when Gibbons pointed it out. When they asked the defendant about a backpack that he had been carrying on the day of the shootings, he responded that he brought it with him to New York, it contained clothing and a gold chain, and he pawned the gold chain in Jersey City. Officers then questioned him about the chain.

The pawn ticket had not been individually inventoried on the defendant's property log, which contained an entry for "miscellaneous papers." At Gibbons's request, the Jersey City police bagged the ticket separately as evidence before the officers returned to Massachusetts. It remained in the custody of the Jersey City police until February 3, when Jersey City officers, acting on an affidavit from a Massachusetts officer, obtained a warrant to seize the chain, and the Massachusetts and Jersey City officers jointly executed the warrant.

The defendant argues that the pawn ticket was seized im-

Edrike's testimony about Gregory Jr.'s statement, but Edrike's statement to his mother was not itself an excited utterance.

properly under *Commonwealth* v. *Vuthy Seng*, 436 Mass. 537, 550-552, cert. denied, 537 U.S. 942 (2002) (*Vuthy Seng*) (inventory searches "are justified to safeguard [a] defendant's property, protect the police against later claims of theft or lost property, and keep weapons and contraband from the prison population"). The defendant maintains that the search here served none of these purposes, since the defendant was in the custody of the Jersey City police, he had been searched, his property had been inventoried, and there was no reason for the Massachusetts officers (who knew they would not be taking custody of the defendant because he was to be held pending rendition proceedings) to examine or set aside as evidence any of the property.

An inventory search may not be a pretext for an investigatory search. See *id.* at 551-552 & n.12. However, even were we to assume, without deciding, that the seizure of the pawn ticket was in violation of *Vuthy Seng, supra*,[20] and that a warrant should have been obtained before the ticket was set aside as evidence and thereby seized, defense counsel was not ineffective for failing to move to suppress the pawn ticket and the chain. Even had both motions been allowed, it would have made no difference for the defendant. There was ample other evidence concerning the chain, from Garcia, who saw Gregory Sr. wearing it on the morning of the shooting, described it, and drew a picture of the distinctive links; from the defendant's sister in New York, who saw him wearing it on January 4; and

---

[20]We do not address the propriety of the New Jersey officers' actions in segregating and setting aside the pawn ticket, and placing it atop the defendant's other inventoried possessions, where it would be visible to the Massachusetts officers. Notwithstanding documentary evidence suggesting that their actions in connection with the pawn ticket, perhaps initially folded and contained within an envelope that was inside the defendant's wallet, may not have been in compliance with Jersey City police procedures regarding inventory searches, the judge made no findings with respect to this matter.

Resolution of the point would, in any event, serve no deterrent purpose for Massachusetts police. There is no suggestion in the record that Massachusetts police had earlier communicated with Jersey City police concerning a missing gold chain or anything else to which the pawn ticket might be pertinent, and it appears that Jersey City police were acting independently in this regard. The Massachusetts officers were unaware of any such actions when they later saw the unfolded ticket on the desk in the detective squad room. They acted properly thereafter in working with the Jersey City officers to obtain a warrant, based on the pawn ticket, to seize the chain.

from Cotto's detailed testimony. Moreover, the defendant described in his statement taking the chain from around Gregory Sr.'s neck, wearing it "rocking . . . with respect" for Gregory Sr., and pawning it in New Jersey.[21]

4. *Review pursuant to G. L. c. 278, § 33E.* Although the defendant did not request relief under G. L. c. 278, § 33E, we have reviewed the entire record pursuant to our duty under that statute, and conclude that there was insufficient evidence to support the convictions of murder in the first degree on a theory of extreme atrocity or cruelty. As stated, the victims, apparently unaware, were shot at close range in the back of the head. The medical examiner testified that the victims would have died virtually instantaneously. See *Commonwealth* v. *Brown*, 386 Mass. 17, 28 & n.11 (1982). While either of two shots to each of the victims' heads could have been fatal, there was no evidence of extensive wounding or significant disproportion between the means necessary to cause death and those used. Contrast *Commonwealth* v. *Patterson*, 432 Mass. 767, 773-774 (2000), *S.C.*, 495 Mass. 626 (2005) (five shots to head causing massive brain damage and "significant number of extensive wounds" was disproportionate). That being said, the evidence amply supports the convictions of murder in the first degree, and we have found no basis for granting extraordinary relief.

*Judgments affirmed.*

*Order denying motion for a new trial affirmed.*

---

[21]The defendant asserts a number of other errors in his new trial motion, none of which creates a substantial likelihood of a miscarriage of justice. He points to counsel's failure to object for cause to one juror whom the judge had determined, following a voir dire concerning the juror's prior professional acquaintance with the prosecutor, could be fair and impartial. The defendant claims without support that Cotto testified falsely at trial, as did various Massachusetts police officers at the evidentiary hearing on his motion for a new trial; the judge found explicitly that the officers were credible.

The defendant protests also the judge's ruling that, if the defendant were going to testify at the hearing on the motion for a new trial, he would have to do so before the other testimony on the first day; the hearing was then continued so that the parties could attempt to resolve issues with obtaining written statements from the Jersey City police officers, who were unable to appear and testify. There was no error. The defendant consulted with counsel, was asked if he would testify, and decided not to do so.