NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11221


COMMONWEALTH  vs.  ERIC J. DURAND.



Bristol.     May 6, 2016. - October 7, 2016.

Present:  Gants, C.J., Cordy, Duffly, Lenk, & Hines, JJ.[1]


Homicide.  Assault and Battery.  Constitutional Law,
     Confrontation of witnesses, Admissions and confessions,
     Voluntariness of statement, Assistance of counsel, Double
     jeopardy.  Evidence, Cross-examination, Admissions and
     confessions, Voluntariness of statement, Hearsay, Expert
     opinion.  Witness, Cross-examination, Expert.  Practice,
     Criminal, Capital case, Confrontation of witnesses, Motion
     to suppress, Admissions and confessions, Voluntariness of
     statement, Assistance of counsel, Mistrial, Hearsay,
     Argument by prosecutor, Conduct of prosecutor, Dismissal,
     Double jeopardy, Instructions to jury.




     Indictments found and returned in the Superior Court
Department on December 11, 2003.

     After review by this court, 457 Mass. 574 (2010), the cases
were tried before Robert J. Kane, J.

     Gary G. Pelletier (Timothy J. Bridl with him) for the
defendant.
     Tara L. Blackman, Assistant District Attorney, for the
Commonwealth.

     [1] Justices Cordy and Duffly participated in the deliberation
on this case prior to their retirements.

HINES, J. The defendant was convicted by a jury in 2006 of murder in the first degree and assault and battery with a dangerous weapon, in connection with the October, 2003, death of a four year old child. Because of errors in the defendant's first trial, this court reversed those convictions and remanded the case to the Superior Court for a new trial. Commonwealth v. Durand, 457 Mass. 574, 601 (2010). On August 29, 2011, a jury again convicted the defendant of murder in the first degree by extreme atrocity or cruelty, and assault and battery by means of a dangerous weapon. The judge sentenced the defendant to life in prison without the possibility of parole on the murder conviction to be served concurrently with a term of from two to four years in State prison on the assault and battery conviction.

On appeal, the defendant asserts error in (1) the limitation of his right to cross-examine the medical examiner; (2) the denial of his motion to suppress statements; (3) the denial of the motion for a mistrial after the jury were exposed to inadmissible evidence; (4) the admission of hearsay testimony by one of the Commonwealth's expert witnesses; (5) the denial of the motion for a mistrial related to improper statements made during closing arguments; (6) the denial of the motion to

dismiss on double jeopardy grounds for prosecutorial misconduct; and (7) the denial of a requested jury instruction. Although we conclude that the Commonwealth's closing argument improperly referenced inadmissible evidence, this error alone does not require a new trial or other relief. We also have conducted a review pursuant to G. L. c. 278, § 33E, and we discern no basis to grant relief.

Background. We summarize the facts the jury could have found, reserving certain details for later discussion. At around the time of the victim's death, the defendant was the boy friend of the victim's mother. The mother lived with her children, the victim and his twin brother, in the basement of a friend's home. The defendant was a frequent overnight guest. Although the defendant had a good relationship with the victim's twin brother (twin), his relationship with the victim was strained. The defendant often called the victim "pissy pants" or "piss pants" because the child "sometimes" urinated in his pants and was not as large as his older twin. The defendant did not like that the victim was "clingy" with his mother and antagonized the child and called him "Mama's boy." This conduct intimidated the victim and occasionally caused him to cry.

On October 20, 2003, the date of the victim's death, the mother departed early in the morning for work and left the victim and his twin with the defendant. A roommate who lived in

one of the basement rooms, and who often took care of the twins, was also home. Later that morning, the victim urinated on himself and the defendant told him to stand in the corner as punishment. When the victim asked to use the bathroom, the defendant refused. The defendant called the victim "piss pants." When the victim turned around in response, the defendant threw a toy shark at the child's face. The roommate, who was present, later testified that the defendant threw the toy "kind of hard," and that he "looked a little angry or mad" as he did so.

When the defendant began to take care of the victim's wet clothes, the victim urinated on the defendant's pants. The defendant showed the roommate the wet spot on his pants, and although she thought that the defendant seemed upset, he stated that it was "no big deal" because he could just go home and get another pair of pants. The defendant took the victim into the upstairs bathroom to wash him while the roommate went upstairs to the kitchen. The roommate saw the defendant walk by the kitchen with the victim and assumed they were returning to the basement. She came across the twin while she was upstairs and took him back downstairs to the twins' room. She noticed that the victim was lying on the bed, not moving, but also that he did not look to be in any distress. She returned upstairs.

Thereafter, the defendant came upstairs to tell the roommate that the victim had fallen down the stairs. The roommate remained at the computer she was using; the defendant returned to the basement. Soon thereafter, the defendant returned upstairs and told her that the victim was "acting weird." Again, she remained at the computer and the defendant went back to the basement. Moments later, the defendant returned a third time and said that something was "seriously wrong." The roommate ran downstairs to the twins' bedroom and found the victim lying in bed, not moving, with his eyes rolled back. She telephoned the mother, who spoke to the defendant and told him to telephone 911. He did so. During both telephone calls, the defendant explained that the victim had fallen down the stairs. Emergency medical technicians arrived and found the victim "cool, cold" to the touch. They were not able to resuscitate the victim, who was later pronounced dead at a hospital.

That same day, detectives from the New Bedford police department asked the defendant if he would accompany them to the police station for an interview. The defendant agreed. His six-hour interview was recorded with the defendant's consent. During that interview, the defendant alternately told police that he had carried the victim down the stairs and that the victim had been injured by falling down the stairs. He also

denied throwing anything at the victim.  However, he admitted to police that while he was in the bathroom with the victim, he noticed that the victim appeared "scared" and was shaking while using the toilet.  The detectives informed the defendant that the victim had died and that the victim's injuries were not consistent with a fall down the stairs.  Despite aggressive questioning, the defendant repeatedly denied any involvement in the victim's death.  After the defendant left the police station, he telephoned the roommate and told her not to say anything to the police about his throwing the toy shark at the victim because "they didn't need to know."

The following day, the mother went to the defendant's home. During the conversation, the defendant claimed that the victim fell down the stairs.  The police arrived, requested another interview, and the defendant agreed.  He went to the police station, and this interview also was recorded.  Detectives informed him that an autopsy report showed that the cause of death was a blow to the victim's stomach.  The defendant again denied involvement in the victim's death.  The police arrested the defendant for murder.  While being transported for his arraignment, the defendant tearfully confessed to a security officer that he had tripped on the stairs and fallen on the victim.

The medical testimony was that the victim died as a result of blunt force trauma to the abdomen, resulting in a rupture of the duodenum and a transection of the pancreas. The fatal injuries were not consistent with a fall down a flight of stairs or with a blow delivered by a child of the same age as the victim's brother. The defendant's theory, that the victim's injuries were caused by his twin brother during horseplay, was supported by an expert witness who opined that the injuries could have resulted from the twin jumping on the victim's stomach.

Discussion. 1. Confrontation and due process. The defendant argues that the judge's limitation of his right to cross-examine the Commonwealth's expert, Dr. Abraham Philip, regarding an electronic mail (e-mail) message violated his right to confrontation as guaranteed by the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. More specifically, the defendant contends that the e-mail message was the basis of the witness's termination from his position with the office of the chief medical examiner and, therefore, it was probative of the expert's competence and bias. He claims that his right to cross-examination on the issue was expressly protected under Bullcoming v. New Mexico, 564 U.S. 647, 652, 662 (2011) (confrontation clause implicated where "surrogate testimony" of

scientist who did not certify, perform, or observe laboratory test precluded opportunity for defendant to cross-examine testing scientist removed from employment for undisclosed reasons).  The judge denied the request to impeach Dr. Philip with the e-mail message and ruled that any probative value it might have had on the issue of the witness's bias or competence was outweighed by its potential for misleading the jury.[2]  There was no error.

We agree that under the Sixth Amendment and its cognate provision, art. 12, a central purpose of the right of confrontation is "to weed out not only the fraudulent analyst, but the incompetent one as well."  Melendez-Diaz v. Massachusetts, 557 U.S. 305, 319 (2009).  The "lack of proper training or deficiency in judgment may be disclosed in cross-examination."  Id. at 320.  However, "trial judges retain wide

---

[2] The electronic mail message stated in relevant part:

"I finalized the report on [the victim], a few corrections have to be made, which my secretary will do early this morning.  My problem is I cannot find the original charts on this case, to check if everything else is okay.  The last I heard the file was with [an attorney], and she locked it in her office and has been away on Thursday and Friday.

"There are some very bizarre events going on in the office with weird accusations being leveled against me.  So when you arrange with [the attorney] to hand over the file to me, please insist that a witness be present in the room to prevent weird charges of having urinated on the chart or farted while working on the chart being leveled against me by the head honcho who runs this agency."

latitude . . . to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues . . . or interrogation that is repetitive or only marginally relevant." Commonwealth v. Woodbine, 461 Mass. 720, 751 (2012), quoting Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986).  We review a judge's imposition of such limits for abuse of discretion.  See Commonwealth v. King, 445 Mass. 217, 245 (2005), cert. denied, 546 U.S. 1216 (2006).

As a threshold matter, the defendant's reliance on Bullcoming, which shares only a superficial resemblance to the facts in this case, is misplaced.  In Bullcoming, the United States Supreme Court held, in a case where the analyst who had performed the testing had been terminated from his position prior to trial, that testimony by a "surrogate" analyst violated the defendant's right to confrontation by preventing the inquiry whether incompetence or dishonesty resulted in removal from his position.  Id. at 661-662.  The pivotal consideration in Bullcoming was that the analyst did not testify at the trial. Bullcoming does not stand for the proposition, as the defendant suggests here, that the right to confrontation extends to the particular reason for the witness's termination from his position as a medical examiner.  Thus, Bullcoming is distinguishable because the Court's analysis applies only where

the expert was not produced at trial.  Here, Dr. Philip testified at the trial and was subject to cross-examination, except for the limitation imposed by the judge.

The judge's ruling prohibiting cross-examination concerning the e-mail message was not an abuse of discretion.  L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).  First, the judge knew about Dr. Philip's civil case against the medical examiner's office and knew that the termination was not based on Philip's ability to conduct or report on the medical aspects of his job.  Philip v. Cronin, 537 F.3d 26, 31-32 (1st Cir. 2008).  Second, the defendant's proffer failed to suggest any causal relationship between Dr. Philip's termination and his professional competency.  Defense counsel outlined the disputed e-mail message and a response to it from the former prosecutor allegedly showing encroachment of law enforcement, the published Philip v. Cronin opinion, and personal testimony from Dr. Philip regarding his inability to access the physical file containing his notes.  At most, the message from the former prosecutor showed concern regarding Dr. Philip's professionalism; there was no concern expressed regarding Dr. Philip's capabilities. Third, the judge ruled that defense counsel could ask Dr. Philip whether he was hindered in his efforts to complete the autopsy report, whether he felt pressured to finish the report within a time frame that was contrary to his normal standards, and

whether any diminishment of memory may have affected the final report. Defense counsel did not question Dr. Philip regarding any pressures he experienced from the prosecutor or from his superiors at the medical examiner's office.

2. Motion to suppress. The defendant argues that the motion judge, who was also the trial judge, erred in denying his motion to suppress statements made to the police during two police interrogations on October 20 and 21, 2003, on the grounds that he invoked his right to remain silent and his right to counsel. Although the defendant could have challenged the judge's ruling on these grounds in his first appeal, he did not do so. See Commonwealth v. Durand, 457 Mass. 574, 590-598 (2010). He argued only that the motion judge erred in ruling that the statements made to the police on October 20 were voluntary. Id. at 593. We affirmed, concluding that despite the use of "improper interrogation tactics" by the police, the statements made on October 20, 2003, were voluntary. Id. at 598. Passing the question whether our G. L. c. 278, § 33E, review of the "whole case, both the law and the evidence," Commonwealth v. Gunter, 459 Mass. 480, 485-486, cert. denied, 132 S. Ct. 218 (2011), quoting Dickerson v. Attorney Gen., 396 Mass. 740, 744 (1986), necessarily encompassed the judge's denial of the motion on these grounds as well, we address the merits of the defendant's claims. There was no error.

"In reviewing a ruling on a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error 'but conduct an independent review of his ultimate findings and conclusions of law.'" Commonwealth v. Craan, 469 Mass. 24, 26 (2014), quoting Commonwealth v. Scott, 440 Mass. 642, 646 (2004). "[O]ur duty is to make an independent determination of the correctness of the judge's application of constitutional principles to the facts as found." Commonwealth v. Bostock, 450 Mass. 616, 619 (2008), quoting Commonwealth v. Mercado, 422 Mass. 367, 369 (1996). However, where "the judge's findings are based almost exclusively on the two videotapes of the defendant's interviews, . . . 'we are in the same position as the [motion] judge in reviewing the videotape,' and need not accord such deference." Durand, 457 Mass. at 596, quoting Commonwealth v. Novo, 442 Mass. 262, 266 (2004). See Commonwealth v. Bean, 435 Mass. 708, 714 n.15 (2002).

a. Background. We recite the motion judge's findings of fact supplemented with evidence in the record that is uncontroverted or implicitly credited by the judge. See Commonwealth v. Melo, 472 Mass. 278, 286 (2015). On October 20, after the police read the defendant the Miranda rights, he inquired about his eligibility for public counsel but then remarked, "I do work, so, I don't believe I'm going to need a lawyer anyway, but I'm just saying, like you said, the court

will appoint one . . . . Well, I don't need one." Later in the same interview, the defendant told the officers, "I want to go home and I want to go to bed." Later, he asked, "Can I go please? Can I go please?" The defendant readily answered the police officers' subsequent questions. Near the end of the six-hour interview, the defendant stated, "Let's stop. Let's just, you guys are going to drive me crazy." One of the police officers responded, "Okay. If you want to stop, you got to let us know." The defendant continued to talk and the police continued to press for a confession. The defendant was asked again, "Okay, do you want to stop?" He responded, "Please," and the interview concluded a few moments later.

At the second interview on October 21, after being informed of his right to remain silent, the defendant replied, "Of course I want to talk to you. I want to get this resolved." Toward the middle of the interview, the defendant stated, "I am going to have to get a lawyer. Everything is going to come down on me because you think that I was in the room with [the victim] at that certain time when he died." The defendant continued to speak with the police at length.

b. Right to remain silent. "The Fifth Amendment provides that '[n]o person . . . shall be compelled in any criminal case to be a witness against himself."' Commonwealth v. Simon, 456 Mass. 280, 285, cert. denied, 562 U.S. 874 (2010). "In Miranda

[v. Arizona, 384 U.S. 436, 444 (1966)], the United States Supreme Court established a 'prophylactic' mechanism . . . to safeguard the protections afforded by the Fifth Amendment during police interrogation" (citation omitted). Simon, supra. Thus, Miranda warnings are required only when a suspect is subject to a custodial interrogation. Id. In all cases, "responsibility for invoking the protections guaranteed by Miranda . . . and art. 12 rests squarely in the hands of criminal defendants" (citation omitted). Commonwealth v. Collins, 440 Mass. 475, 479 n.3 (2003). Invocations of the right to remain silent must be scrupulously honored. Michigan v. Mosley, 423 U.S. 96, 104 (1975). When faced with an ambiguous request to stop questioning, the police may seek to clarify the defendant's intent. Commonwealth v. Santos, 463 Mass. 273, 286 (2012). However, clarifications of a defendant's request to stop questioning cannot "be used to cast retrospective doubt on . . . the initial request itself" (quotation and citation omitted). Id. at 287. Accordingly, a defendant may invoke the right to remain silent after initially waiving that right. Commonwealth v. Clarke, 461 Mass. 336, 343 (2012), quoting Commonwealth v. Bradshaw, 385 Mass. 244, 265 (1982). The subsequent invocation "must be clear and unambiguous[], . . . such that a reasonable police officer in the circumstances would understand the statement to be an invocation of the Miranda right" (quotations

and citations omitted).  Commonwealth v. Howard, 469 Mass. 721, 731 (2014).  Statements made during a custodial interrogation may still be admissible at trial if "the Commonwealth [can] prove beyond a reasonable doubt that the defendant voluntarily, knowingly, and intelligently waived these rights before making the statement."  Santos, 463 Mass. at 283.

Here, the defendant was not in custody and therefore had no right of silence to invoke.  See Simon, 456 Mass. at 287.  However, assuming, arguendo, that the interviews were custodial, the defendant did not clearly invoke his right to silence after waiving his Miranda rights at each interview.[3]  The defendant's statements, such as "I can't take any more of this" and "I want to go home and I want to go to bed," did not indicate his unwillingness to continue the interrogation.  Indeed, after these ambiguous statements, the defendant continued to talk without further prompting.  A reasonable police officer in the circumstances would not have understood these statements to be an invocation of the right to silence.  Howard, 469 Mass. at

---

    [3] Citing Commonwealth v. Clarke, 461 Mass. 336, 337 (2012), the defendant erroneously claims that his invocation did not need to be unambiguous:  "[W]e hold that, in the prewaiver context, art. 12 does not require a suspect to invoke his right to remain silent with the utmost clarity, as required under Federal law.  See Berghuis v. Thompkins, [560 U.S. 370, 386] (2010)."  Because the defendant waived his right to silence at the start of each interview, the prewaiver inquiry of Clarke is inapplicable.

731. Contrast Commonwealth v. Santana, 465 Mass. 270, 282 (2013) ("[I] couldn't say any more" invoked right to silence after Miranda waiver); Santos, 463 Mass. at 285 ("I'm not going on with this conversation" invoked right to silence postwaiver). There was no error in the judge's determination that the defendant did not invoke his right to silence.

c. Right to counsel. "Once the defendant invokes his right to an attorney, the police must stop questioning until an attorney is present." Commonwealth v. Jones, 439 Mass. 249, 258 (2003). Nonetheless, "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking a right to counsel, our precedents do not require the cessation of questioning." Commonwealth v. Judge, 420 Mass. 433, 450 (1995), quoting Davis v. United States, 512 U.S. 452, 459 (1994).

Here, the defendant equivocally stated, "I am going to have to get a lawyer. Everything is going to come down on me . . . ." We agree with the motion judge that the defendant did not request an attorney, rather, he expressed a future need for a lawyer if he faced charges for the victim's death. Compare Jones, 439 Mass. at 258-259 ("[I'm] going to need a lawyer sometime" not invocation of right to counsel). The defendant's anticipatory statement is in marked contrast to the invocations

that we deemed effective in Santos, 463 Mass. at 282 ("I'm not going on with this conversation.  I want a lawyer"), and Commonwealth v. Contos, 435 Mass. 19, 28 (2001) ("I think we're going to stop, and I think I'm going to get a lawyer.  If this is the way this is going, you're either accusing me or charging me") There was no error in the judge's determination that the defendant did not invoke his right to counsel.  Assuming for the sake of argument that the defendant was in custody, the motion to suppress was properly denied where the defendant failed to invoke his right to silence and his right to counsel.

3.  Motion for mistrial.  The defendant argues that the trial judge erred in denying his motion for a mistrial after the jury were repeatedly exposed to inadmissible evidence resulting in prejudice that was not cured by the judge's instructions. The defendant's claim stems from what appear to be unintentional mistakes[4] in the presentation of the audio-visual recording of the defendant's interviews at the police station to the jury. We address separately the claimed errors.

a.  First error.  In response to a pretrial motion in limine filed by the defendant, the judge ordered the redaction of a portion of the defendant's statement during which he

_____

[4] The judge indicated at sidebar that the prosecutor's publication of unredacted video was unanticipated and the result of human error.

admitted that on one occasion, he had pushed the victim's twin brother after the twin dropped the defendant's infant daughter. More specifically, the following statements were to be redacted before the video of the interview was played for the jury:

> "I never touch her kids. And, like, the other day, [the twin] dropped . . . my little daughter, [eleven] months. She was actually [ten, eleven] months at that time. And he dropped her. He picked her up like this [indicating], to get her out of the way and threw her down on the ground. And I got mad, and I pushed [the twin] on the ground. Yes, I did. That was the only time that I've ever laid hands on [the twin] or [the victim], ever. And that was the only reason why, it was uncontrollable that he threw my [ten] month year-old baby, literally lifted her up like this [indicating] and throwed [sic] her on the ground just so he could get through the doorway, which I thought that was wrong, and I was hurt by that, because the baby was screaming. And I got up off the bed, and I pushed him. That was a while back, but he didn't get any hurt, he didn't get hurt or anything. He gave his mother a fuss, and he didn't like me. Obviously, he wouldn't like me because I pushed him. But he didn't see the wrong in throwing the baby like that. That was wrong for me to push him, you're absolutely right, but he didn't get hurt or anything like that. It wasn't out to hurt him. It was just out to let him know not to throw babies, [ten] month year-old babies."

The redaction did not occur and the excluded statements were played for the jury. The defendant objected and moved for a mistrial. The judge denied the defendant's motion but gave a curative instruction to disregard the statement regarding interactions between the defendant and the twin.[5]

---

[5] The judge's full instruction was:

b.  Second error.  The next portion of the recorded statement that the defendant claims was erroneously shown to the jury ended with the police informing the defendant that the victim had died.  The recording then immediately looped back to the beginning of the recorded interview showing the defendant laughing with the police.  The defendant objected and reiterated prior concerns regarding prejudicial editing.  The prosecution conceded that there was an agreement between the parties to prevent this loop back.  The judge gave another curative instruction, explaining that the automatic restart of the recording created a false sequence that should be disregarded.  The defendant's renewed request for a mistrial was denied.

c.  Third error.  Soon thereafter, the jury viewed another segment of the interview that the judge had determined should be redacted, wherein one of the detectives stated:  "We talked to [the twin].  Did you kick him?"  The defendant again renewed his request for a mistrial.  The judge, however, denied the request and refused to issue another curative instruction, determining

---

"Jurors, the segment that you just saw relating to any contact between the defendant and [the twin] is to be stricken from your minds.  Just banish that from your minds.  Disregard it just like I tell you when a witness says something and I exclude it.  Just remove it.  You do it consciously, and I know you'll follow my instructions, and that's my clear instruction."

that the prejudice created from this single statement was de minimis.

We review the denial of motion for a mistrial for an abuse of discretion. Commonwealth v. Gallagher, 408 Mass. 510, 517 (1990). When a jury have been exposed to inadmissible evidence, the judge may rely on a curative instruction to "correct any error and to remedy any prejudice" (citation omitted). Commonwealth v. Kilburn, 426 Mass. 31, 38 (1997), S.C., 438 Mass. 356 (2003). "As long as the judge's instructions are prompt and the jury do not again hear the inadmissible evidence . . . a mistrial is unnecessary." Commonwealth v. Garrey, 436 Mass. 422, 435 (2002).

Here, the defendant argues that his multiple requests for a mistrial should have been granted because inadmissible evidence was repeatedly presented to the jury and the resulting prejudice was not curable with an instruction to disregard it. We disagree. Although the defendant properly relies on the expectation that the proponent of evidence bears the responsibility to comply with a court order[6] and that in this case the Commonwealth should reap the consequences of its failure to do so, we are not persuaded that the judge's curative

_____

[6] See, e.g., Firo v. State, 878 S.W.2d 254, 256 (Tx. Ct. App. 1994) ("the party offering the evidence has the burden to redact or sanitize a document . . . before [it] is properly admissible").

instructions were inadequate. In this case, the jury heard each excluded statement only once. See Gallagher, 408 Mass. at 517-518 (witness's solitary reference to defendant's incarceration during ten-day trial "could not have tainted the jury's verdict"). The judge then gave two separate instructions, addressing the defendant's statement that he had pushed the twin and then the improper "loop back." See Garrey, 436 Mass. at 435 (prompt instruction sufficiently remedied any prejudice). In addition, jurors are presumed to have followed the judge's instructions to disregard the evidence. See Commonwealth v. Qualls, 440 Mass. 576, 584 (2003). There was no prejudice.

We also agree with the trial judge that the officer's question whether the defendant kicked the twin was fleeting and did not likely influence the jury as there was abundant admissible evidence showing that the defendant regularly ridiculed and kicked the victim. See Commonwealth v. Cunneen, 389 Mass. 216, 223-224 (1983) ("vague and fleeting comment [was] not likely to influence, or even seize the attention of the jury"). Regardless, "[t]he statement was not so inflammatory that a denial of the defendant's motion for a mistrial was inherently an abuse of discretion." Commonwealth v. Bryant, 447 Mass. 494, 503 (2006).

The defendant likens the impact of this bad character evidence to an error in his first trial, when the jury were

permitted to hear testimony that the defendant slapped the victim's mother. Durand, 457 Mass. at 599-600. We recognize that the cumulative effect of improper statements may warrant a finding of prejudice. However, the challenged statements here were sufficiently dissimilar that we do not perceive any prejudice to the defendant.[7]

4. Hearsay testimony. The defendant argues that the trial judge erred when he permitted Dr. Amy Goldberg to testify "based upon studies that she did not perform and literature that she did not author," because it constituted inadmissible hearsay.[8] Specifically, he asserts that the literature forming the basis of Dr. Goldberg's opinion was not independently admissible and therefore her testimony should have been excluded. The defendant's claim is unavailing. An expert is permitted to rely on hearsay studies to form his or her opinion, but the expert may not testify to the content of those studies during direct

---

[7] The defendant misinterprets our analysis of this issue in Commonwealth v. Durand, 457 Mass. 574, 599-600 (2010). He claims that admission of the bad act evidence in his first trial was reversible error, but we did not consider the prejudicial effect of the error because we reversed on other grounds.

[8] The trial judge conducted a voir dire of Dr. Amy Goldberg, a pediatrician specializing in child abuse, and determined that Dr. Goldberg was a qualified expert who could testify based on her experience and review of relevant scientific literature regarding childhood traumatic injury. He ordered Dr. Goldberg to refrain from referencing her expertise in child abuse -- including use of her professional title -- out of concern that the information would be too prejudicial.

examination. Commonwealth v. McNickles, 434 Mass. 839, 857 (2001). "Only the defendant can open the door on cross-examination to testimony regarding the basis for the expert's opinion, which may invite the expert witness to testify to facts or data that may be admissible . . . and that may be testimonial in nature." Commonwealth v. Barbosa, 457 Mass. 773, 785 (2010), cert. denied, 563 U.S. 990 (2011). This evidentiary rule "is consistent with the right of confrontation." Id. On direct examination, Dr. Goldberg testified that her opinion was based on relevant scientific literature but she did not name specific studies or discuss their factual findings. The defendant's subsequent failure to cross-examine Dr. Goldberg regarding the sources of her opinion did not transform her testimony into inadmissible hearsay. Id. Dr. Goldberg's reliance on treatises and literature not in evidence was proper opinion testimony and did not violate the defendant's confrontation rights.

5. The prosecutor's closing argument. The defendant claims that the prosecutor's closing remarks were highly prejudicial and the judge erred when he declined to issue a curative instruction or grant a mistrial. "Remarks made during closing arguments are considered in context of the whole argument, the evidence admitted at trial, and the judge's instructions to the jury." Commonwealth v. Andrade, 468 Mass. 543, 552 (2014), quoting Commonwealth v. Whitman, 453 Mass. 331,

343 (2009). Because the defendant objected to the argument at trial, we review for prejudicial error. Commonwealth v. Johnson, 463 Mass. 95, 112 (2012).

a. Victim fear. The prosecution began its closing, "For most four year olds, the boogeyman is a figment of their imagination. In this case, there is a boogeyman. There was a boogeyman in the life of [the victim]. He is the defendant in this case." Thereafter, the prosecutor repeatedly referred to the victim's fear of the defendant and characterized the victim's interactions with the defendant as "torture." The defendant renewed his prior objection regarding the irrelevance of victim fear in determining a defendant's culpability. He complains that the prosecution's dramatization of the victim's fear was unfairly prejudicial.

The prosecutor's comment was improper but not prejudicial where, as here, the defendant stated during the police interrogation that he never "touched [the mother's] kids" or hit the victim. He further claimed that in the weeks leading up to the incident, he had been getting along well with the boys and that the victim was no longer afraid of him. When asked how others would describe his relationship with the victim, he replied, "good." Moreover, the defendant vigorously impeached the mother, the roommate, and a daycare provider regarding the allegedly strained relationship between the victim and the

defendant.  Thus, the prosecutor was entitled to argue that the evidence contradicted the defendant's statements.  Indeed, the defendant admitted to police that the victim appeared afraid that morning; that the victim did not normally urinate on the defendant's leg; that the victim was shaking from nervousness in the bathroom; and that the defendant regularly ridiculed the victim.  No curative instruction was warranted where the defendant was aware of the victim's fear and likely to respond to it.

b.  Comment on the defendant's statement excluded as involuntary.  Later in the Commonwealth's closing, the prosecutor argued that the defendant denied throwing a toy rubber shark at the victim:

> "And then you're going to be asked to evaluate the credibility of the defendant on the one day that he's now stuck with the kids, on the one day that everything seems to be going wrong; and you're going to be asked if he was truthful.  And you'll recall in the course of his statements . . . .  He told the police he never -- they asked him, 'Did you ever throw anything at the boy when he was in the corner -- sorry -- that day?  Did you ever throw anything?'  'No.'  We know that's not true.  He threw the shark, hit [the victim] in the mouth.  (Emphasis added.)

The defendant did not object to the statement or request a curative instruction.  Contrary to the prosecutor's suggestion, the defendant had admitted to throwing the shark during the second police interview on October 21, but the judge had suppressed this statement on the ground that it was not

voluntary in light of police promises of leniency. The Commonwealth defends the prosecutor's comment, pointing out that the judge's suppression order did not apply to the defendant's statements during the first police interview on October 20, when he denied throwing anything at the victim. That denial was admitted in evidence as part of the audio-visual recording of the October 20 interview. Although the prosecutor's comment did not violate the letter of the judge's order, it undoubtedly undermined the spirit of the ruling where it unfairly suggested that the defendant withheld the information, and that this act reflected consciousness of guilt. Although we are constrained to conclude that this error was not prejudicial, we note our concern with such unfair tactics that undercut the intended effect of the judge's ruling.

6. Motion to dismiss. Citing United States v. Dinitz, 424 U.S. 600, 601 (1976), the defendant claims error in the denial of his motion to dismiss the indictments on the ground that the double jeopardy clause bars retrial where a prosecutor's bad faith results in a reversal of the first conviction and the defendant is subjected to a second trial. Specifically, the defendant argues that the prosecutor's tactical decision in the first trial to introduce testimony from a substitute medical examiner that was later determined to be a violation of the defendant's rights under the confrontation clause, Durand, 457

Mass. at 587-588, 601, meets the bad faith test. We reject the argument because the defendant has failed to demonstrate prosecutorial misconduct warranting a dismissal on double jeopardy grounds.[9]

We have recognized limited circumstances where prosecutorial misconduct bars retrial: "if the Commonwealth intended to goad the defendant into moving for a mistrial[;] . . . if the 'governmental conduct resulted in such irremediable harm that a fair trial of the complaint or indictment is no longer possible'[;] . . . and where the prosecutor's conduct is otherwise so egregious that dismissal is warranted to deter similar future misconduct" (citations omitted). Commonwealth v. Merry, 453 Mass. 653, 666 (2009). No such conduct occurred here.

At the time of the first trial, Dr. Abraham Philip, the medical examiner who performed the victim's autopsy, was the plaintiff in a pending civil suit alleging wrongful termination against the office of the chief medical examiner. Whether

---

[9] The defendant's reliance on United States v. Dinitz, 424 U.S. 600, 611 (1976) (retrial barred when prosecutorial misconduct is "undertaken to harass or prejudice" defendant), is misplaced because Dinitz was long ago narrowed by the United States Supreme Court. Oregon v. Kennedy, 456 U.S. 667, 679 (1982) (retrial resulting from prosecutorial misconduct prohibited under Federal double jeopardy clause only where prosecution committed said misconduct with intent to provoke mistrial).

because of the lawsuit or not, the Commonwealth chose not to call Dr. Philip as its expert on the cause of the victim's death. Instead, the Commonwealth introduced testimony from a substitute medical expert, Dr. Mark Flomenbaum. Durand, 457 Mass. at 581-590. At that time we had not yet decided Commonwealth v. Nardi, 452 Mass. 379, 391 (2008), in which we held that the confrontation clause precludes on direct examination the testimony of a substitute medical examiner as to the factual findings in an autopsy report. Additionally, the substitute medical examiner's testimony did not create "irremediable harm" that would make it impossible for a subsequent trial to be fair. Merry, 453 Mass. at 666, quoting Commonwealth v. Murchison, 392 Mass. 273, 276 (1984). During both trials, the medical examiners opined that the victim died of blunt force trauma. Presenting Dr. Flomenbaum's opinion that the trauma was from a "forceful squeeze" at the first trial, instead of Dr. Philip's opinion that the trauma was from a punch or a kick, was not so different as to create irremediable harm.

Moreover, the Commonwealth's use of Dr. Philip's testimony during a trial that resulted from the defendant's own appeal does not "amount to an overzealous attempt to obtain 'tactical advantage' over the defendant." Marshall, 463 Mass. 529, 540 (2012), quoting Glawson v. Commonwealth (No. 1), 445 Mass. 1019, 1021 (2005), cert. denied, 547 U.S. 1118 (2006). We further

note that the defendant had no right to compel the Commonwealth to call Dr. Philip during the first trial. Durand, 457 Mass. at 585 ("to the extent that the defendant sought to require the Commonwealth to call Dr. Philip as a trial witness because he was the only witness who could offer an opinion as to the victim's cause and manner of death, the defendant's motion and objection were properly denied").

7. Jury instructions. The defendant argues that the judge erred in declining to instruct the jury regarding the adequacy of the police investigation, the so-called Bowden instruction, because, the defendant claims, it was necessary to "balance the equities" where the judge elected to instruct the jury on consciousness of guilt.[10] Commonwealth v. Bowden, 379 Mass. 472, 486 (1980). The judge declined the request but advised defense counsel that he could "absolutely argue it" during closing.

We have consistently held that "a judge is not required to instruct on the claimed inadequacy of a police investigation.

---

[10] The defendant's claim is centered on testimony from a forensic chemist asserting that, on the day of the victim's murder, the defendant's hands tested positive for the presence of blood. During cross-examination, defense counsel elicited testimony that there had been no confirmatory testing to determine whether the blood belonged to the victim or even whether it was human. In the defendant's first appeal, we concluded that the allowance of similar testimony was not error because "the defendant was free to explore these issues during cross-examination." Durand, 457 Mass. at 598, citing Commonwealth v. Gonzalez, 443 Mass. 799, 810 (2005).

'Bowden simply holds that a judge may not remove the issue from the jury's consideration.'" Commonwealth v. Lao, 460 Mass. 12, 23 (2011), quoting Commonwealth v. Boateng, 438 Mass. 498, 507 (2003). There was no error where the defendant was free to argue, and did argue, during closing that the police investigation was inadequate. See Commonwealth v. Kaeppeler, 473 Mass. 396, 406 (2015).

8. Relief pursuant to G. L. c. 278, § 33E. Although we conclude that the Commonwealth's closing argument contained an improper reference to an inadmissible statement, that error alone does not require a reduction in the defendant's verdict or a new trial. We have examined the record pursuant to our duty under G. L. c. 278, § 33E, and we discern no basis on which to grant the defendant extraordinary relief.

Judgment affirmed.